1  John Armstrong, Cal. Bar No. 183912
2  **Horwitz + Armstrong** A PROFESSIONAL LAW CORP.
   14 Orchard, Suite 200
3  Lake Forest, CA 92630
4  jarmstrong@horwitzarmstrong.com
   (949) 540-6540 (tel.)
5  ATTORNEYS FOR PLAINTIFFS
6  INTERNATIONAL CANNABRANDS LTD and
   LVV HOLDING COMPANY, LTD.
7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

11  INTERNATIONAL                    | CASE NO.
    CANNABRANDS INC., an Alberta,    | ASSIGNED TO:
12  Canada corporation and LVV       |
    HOLDING COMPANY, LTD., a         |
13  Delaware corporation,            | **COMPLAINT FOR**
                                     | **COMPENSATORY and**
14              Plaintiffs,          | **PUNITIVE DAMAGES, AND**
                                     | **FOR EQUITABLE,**
15  *versus*                         | **DECLARATORY RELIEF;**
                                     | **JURY TRIAL DEMANDED**
16  LA VIDA VERDE, INC., a           |
    California corporation; ERIC     | (Demand Exceeds $1,000,000)
17  HARA, a California resident,     |
    individually and as La Vida Verde, |
18  Inc.'s representative; BRYCE     |
    BERRYESSA, a California          |
19  resident, individually and as La |
    Vida Verde, Inc.'s representative; |
20  THOMAS FRYE, a California        |
    resident; BRIAN BRITTON, a      |
21  California resident; EMILIO      |
    EIZNER, a California resident; and |
22  DOES 1 through 10, inclusive,    |
23              Defendants.          |

24

25

26      Plaintiffs INTERNATIONAL CANNBRANDS, INC. and LVV

27  HOLDING COMPANY, LTD ("**Plaintiffs**" or collectively "**ICI**") bring this

28  Complaint ("**Complaint**") against defendants LA VIDA VERDE, INC., a

**FIRST AMENDED COMPLAINT**

California corporation; ERIC HARA, a California resident, individually and as La Vida Verde, Inc.'s representative; BRYCE BERRYESSA, a California resident, individually and as La Vida Verde, Inc.'s representative; THOMAS FRYE, a California resident; BRIAN BRITTON, a California resident; EMILIO EIZNER, a California resident; and DOES 1 through 10, inclusive (collectively "**Defendants**"), and, information and belief, allege as follows.

## THE PARTIES

1.      Plaintiff ICI was incorporated in Alberta, Canada, is a publicly trading under the Canadian Securities Exchange using the symbol "INCB," and is headquartered with its principal place of business in Denver, Colorado.

2.      Plaintiff LVV HOLDING COMPANY, LTD ("LVV") is a Delaware corporation headquartered in Nevada, with its principal place of business in the State of Nevada, and was created by ICI for the purpose of holdings the shares of common stock of defendant LA VIDA VERDE, INC.

3.      Defendant LA VIDA VERDE, INC. is and was always a California corporation with its principal place of business in California.

4.      Defendant ERIC HARA was, at all relevant times mentioned in this Complaint, a California citizen, and is presently residing in the Country of Costa Rica, who committed the acts complained of within this judicial district.

5.      Defendant BRYCE BERRYESSA is and was, at all times mentioned in this Complaint, a California citizen who committed the acts complained of in this judicial district.

6.      Defendant THOMAS FRYE is and was a California citizen at all relevant times mentioned in this Complaint who committed the acts complained within this judicial district.

7.      Defendant BRIAN BRITTON is and was a California citizen who committed the acts complained of within this judicial district.

8.     Defendant EMILIO EIZNER is and was at all times mentioned in this Complaint, a California citizen who committed the acts complained of within this judicial district.

9.     The true names and capacities of the defendants sued herein as Does 1 through 10, inclusive, are unknown to Plaintiffs at this time, and Plaintiffs therefore sue said fictitious defendants by said fictitious names.  Plaintiffs are informed and believe, and so allege that each of the defendants designated in this Complaint by such fictitious names is in some manner responsible for the events and happenings herein referred to, and thereby proximately and foreseeable caused damages to Plaintiffs as alleged here in this Complaint.

10.    Plaintiffs will seek leave to amend their Complaint to add the true names and capacities of said fictitious defendants at such time as they have been ascertained.

11.    Plaintiffs are informed and believe and on that basis alleges that each of the defendants referenced in this Complaint was the agent, servant, representative, partner, or employee of each of the remaining defendants, and that at all times herein mentioned was acting within the scope of such agency, representation, partnership or employment or in some combination of the foregoing, and acted for the mutual benefit or for the benefit of one or more of the other defendants named in this complaint.  Therefore, each DOE defendant is responsible in some manner for the occurrences alleged in this Complaint and for the resulting harm to Plaintiff.

12.    On information and belief, each of the defendants is or was aware of each other defendant's wrongful conduct alleged in this Complaint, agreed to conspire with one or more the other defendants to harm Plaintiffs, or knowingly aided and abetted each other defendant in harming Plaintiffs as alleged in this Complaint.

**JURISDICTION AND VENUE**

13.   This Court has completed, federal Diversity Jurisdiction over this dispute under Title 28 U.S.C. § 1332 because the plaintiffs and defendants are citizens of different States, and the amount in controversy between the parties is over $1,000,000, which is more than $75,000, exclusive of costs and interest.

14.   The acts and omissions complained of, including the misrepresentations and concealments at issue were committed by defendants and each of them within the County of Santa Cruz, California, making the U.S. Northern District Court of California the proper venue for this dispute.

15.   Additionally, this Court has general personal jurisdiction over defendants and each of them because each of them has sufficient minimum contacts in California or otherwise intentionally availed themselves of the benefits of California so as to provide the proper exercise of jurisdiction over them by the Courts in California, as consistent with traditional notions of fair play and substantial justice.

**GENERAL ALLEGATIONS**

16.   Plaintiff ICI is a company dedicated to advancing wellness around the globe (the "**Company**"). It provides cannabis products to consumers throughout North America and in certain jurisdictions internationally.

17.   Defendant LA VIDA VERDE, Inc. is a California licensed cannabis distributor authorized to distribute medical and recreational cannabis products in California.

18.   LA VIDA VERDICE, INC.'s shareholders were defendants ERIC HARA, BRYCE BERRYESSA, THOMAS FRYE, BRIAN BRITTON, EMILIO EIZNER, and DOES 1 through 5 (the "Individual Defendants"), and each of them.

19.   The Individual Defendants intentionally made representations to ICI about defendant LA VIDA VERDE, INC. for the purpose of inducing ICI to purchase defendant LA VIDA VERDE, INC. and to create lucrative employment and stock positions in ICI for the Individual Defendants.

20.   The representations were not true, but plaintiff ICI:

21.   Did not know that defendants' representations were untrue;

22.   Did not have reason to know that the representations were untrue;

23.   Exercised reasonable diligence regarding defendants' representations but did not discover that their representations were untrue.

24.   For example, the Individual Defendants represented to ICI before ICI executed a Purchase and Sale Agreement with defendants to buy LA VIDA VERDE, INC. that LA VIDE VERDE, INC. had over $4.6 million in sales to Brass Knuckles, a popular California licensed brand of cannabis products, however, *after* the sale of LA VIDA VERDE to ICI, ICI discovered that defendants had lost Brass Knuckles as client and the actual sales of Brass Knuckles products were a little over $200,000.

25.   Defendant ERIC HARA knew that he was going to move to Costa Rica, but intentionally concealed this fact from ICI, and represented that he would stay on as defendant LA VIDA VERDE's Chief Executive Officer ("CEO"), making ICI believe that defendant HARA would be running LA VIDE VERDE for ICI post-acquisition in Santa Cruz as HARA had previously been doing before the acquisition.

26.   The Individual Defendants and each of them engaged in the above trickery of ICI to induce ICI to pay millions of dollars more for defendant LA VIDE VERDE than it was worth, and to secure lucrative employment agreements and stock positions.

27.   As a direct and proximate result of defendants' and each of their trickery, misrepresentations, and frauds, ICI was induced to create LVV

HOLDING COMPANY, LTD. to hold the shares of common stock of defendant LA VIDA VERDE, INC. it owns, and to induce plaintiffs ICI and LVV to execute a Purchase and Sale Agreement with defendants.

28.   A true and correct copy of the above-referenced Purchase and Sale Agreement is attached and incorporated here by this reference as Exhibit "A" to this Complaint.

29.   Plaintiffs ICI and LVV discovered defendants' trickery, deceits, frauds, misrepresentations, and intentional concealments after they executed the Purchase and Sale Agreement referenced above with defendants.

30.   After plaintiffs' discovery, plaintiffs attempted to negotiate with defendants a resolution since plaintiffs paid millions more for LA VIDE VERDE, INC. than they would have had plaintiffs known that LA VIDE VERDE had lost its most significant, multi-million dollar client, Brass Knuckles, and that its CEO, defendant HARA was essentially going to "retire" by moving to the Country of Costa Rica while still acting as CEO for LA VIDE VERDE whose day to day business operations are in Santa Cruz, California.

**FIRST CAUSE OF ACTION**

**California Common Law Fraud**

**(Against All Defendants)**

31.   Plaintiff adopts by this reference paragraphs 1-30 here.

32.   The Individual Defendants made the above misrepresentations to plaintiffs for the purpose of inducing plaintiffs to pay a much higher price than warranted for defendant LA VIDA VERDE by intentionally concealing that LA VIDA VERDE had lost Brass Knuckles as a its largest, multi-million dollar in revenue producing client to doing a little more than $200,000 a year, and by intentionally concealing defendant HARA's intention to move to Costa Rica while acting as CEO for LA VIDA VERDE post-closing.

33.   Plaintiffs were not aware of the true facts, did not have reason to

**COMPLAINT**

believe that defendants were intentionally trying to deceive and conceal material facts from plaintiffs for the purpose of getting plaintiffs to agree to the terms in the parties' Purchase and Sale Agreement attached as Exhibit "A," and could not in the exercise of reasonable diligence discovered defendants' trickery.

34.    Defendants and each of them conspired with one another. All of them knew the true facts but worked together to conceal the true facts from plaintiffs. Defendants did this to intentionally trick plaintiffs into signing the Purchase and Sale Agreement attached to this Complaint.

35.    Further, defendants and each of them aided and abetted each other by knowing the true facts, but intentionally refusing to disclose the true facts until well after Purchase and Sale Agreement between them and plaintiffs was fully executed, and plaintiffs had invested too much money into the deal to be able to efficiently rescind.

36.    Accordingly, plaintiffs seek over $5,000,000 in damages for defendants' trickery, jointly and severally, or such other amount as may be proved at time of trial.

37.    Further, because defendants' intentional trickery, punitive damages in an amount sufficient to punish and deter defendants and each of them should be added to the actual damages defendants and each of them caused plaintiffs.

38.    Finally, the court should issue a judicial declaration that because of defendants' and each of their trickery, frauds, deceits, and concealments, that plaintiffs are not obligated to provide defendants any more money or things under the parties' Purchase and Sale Agreement, and that defendants and each of them, to the extent that have or have attempted to take their stock back in defendant LA VIDA VERDE, INC., should be ordered to give their LA VIDE VERDE stock back to plaintiffs to make plaintiffs whole.

WHERFORE, Plaintiffs request judgment be entered against defendants and each of them, as set out in its request below.

## SECOND CAUSE OF ACTION

## Breach of Contract

## (Against All Defendants)

39.     Plaintiff adopts by this reference all the foregoing paragraphs in this Complaint here.

40.     Under Paragraphs 2.6 "Financial Matters," Paragraph 2.09 "Absence of Certain Changes and Events," and Paragraph 2.16 "Receivables" of the parties' Purchase and Sale Agreement required defendants and each of them to accurately and truthfully represent defendant LA VIDA VERDE's financial condition.

41.     Despite these express, contractual, written promises, defendants did not perform these contractual promises, but instead misled and intentionally concealed that LA VIDE VERDE's financial condition was much, much worse than represented by the financial documents defendants and each of them provided plaintiffs before the closing and execution of the Purchase and Sale Agreement.

42.     Defendants also knew that defendant HARA intended to move to Costa Rica, but intentionally concealed this fact from plaintiffs, in breach of the implied covenant of good faith and fair dealing.

43.     Defendants knew HARA's moving to Costa Rica would have materially affected the price that plaintiffs would be willing to pay for LA VIDE VERDE and would have affected plaintiffs' desire to do this deal with defendants and each of them, so defendants conspired and provided substantial help and assistance to one another to keep HARA's move to Costa Rica a secret from plaintiffs—especially since HARA was going to remain the CEO for LA VIDE VERDE, which operates in Santa Cruz, California and has no operations in

1   Costa Rica.

2   44.    Additionally, in the first quarter of 2019, defendants attempted to sell

3   their 49% interest in LA VIDA VERDE to Black Bird in violation of Paragraph

4   5.02 of the parties' Purchase and Sale Agreement.

5   45.    Accordingly, for their contract breaches, plaintiffs seek $5,000,000 in

6   compensatory damages against defendants and each of them, and further

7   seek a judicial declaration that plaintiffs did not owe  any more money to

8   defendants because of the contract breaches, trickery, and intentional deceits

9   and concealments, and further, that defendants and each of them should be

10  ordered to turn over their stock in LA VIDA VERDE that they held as security

11  in the event of non-payment of the full-stated contract purchase price under

12  the Purchase and Sale Agreement.

13                          **REQUEST FOR JUDGMENT**

14  46.    WHEREFORE, Plaintiffs requests judgment be entered against

15  defendants, and each of them, as follows:

16  47.    For damages according to proof, including expert investigation costs to

17  determine the harm defendants caused plaintiffs;

18  48.    For prejudgment interest at the rate of 7% per annum on plaintiffs'

19  fraud damages and at the rate of 10% per annum for plaintiffs' breach of

20  contract damages awarded;

21  49.    For punitive and exemplary damages proven at time of trial in an

22  amount sufficient to deter and punish defendants and each of them;

23  50.  For a judicial declaration that defendants and each of them are not

24  entitled to any more money from plaintiffs under the parties' Purchase

25  and Sale Agreement, and that any stock in LA VIDA VERDE that

26  defendants or any of them has retained as security for payment from

27  plaintiffs be turned over to plaintiffs immediately;

28  51.  For any and all fees and costs, expenses and costs of suit herein

incurred and as allowed by law, including but not limited to actual attorney's fees, statutory costs, professional, technical consultant or other expert witness fees and costs, investigative expenses, and all other expenses plaintiffs lawfully incurred and may recover;

52.   For such other and further relief as the court may deem proper.

## JURY TRIAL DEMANDED

53.   Plaintiffs further demand a trial by jury on their damage claims against defendants and each of them, under the U.S. and California Constitutions and as otherwise provided by law.

DATED: November 23, 2019          **HORWITZ + ARMSTRONG**


                                  */s/ John R. Armstrong*
                                  _____
                                  John Armstrong,
                                  ATTORNEYS FOR PLAINTIFFS,
                                  INTERNATIONAL
                                  CANNABRANDS, INC. and LVV
                                  HOLDING COMPANY, LTD.

Exhibit "A"

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "**Agreement**") is made as of September 19, 2018 (the "**Effective Date**"), by and among La Vida Verde, Inc., a California corporation (the "**Company**"), Eric Hara, individually and in his capacity as a Seller Representative ("**Mr. Hara**"), Bryce Berryessa, individually and in his capacity as a Seller Representative ("**Mr. Berryessa**" and, together with Mr. Hara, the "**Seller Co-Representatives**"), the Persons listed on the Selling Shareholders Schedule attached hereto as <u>Exhibit A</u> (the "**Selling Shareholders Schedule**") (collectively referred to herein as "**Non-Management Shareholders**" and, together with Mr. Hara and Mr. Berryessa, sometimes individually referred to as a "**Seller**" and collectively as the "**Sellers**"), International Cannabrands Inc., a corporation incorporated under the laws of the Province of Alberta ("ICI"), and LVV Holding Company Ltd., a Nevada corporation ("**Buyer**"). Capitalized terms used herein are defined in the text.

## PREAMBLE

Sellers own all of the issued and outstanding shares of capital stock of the Company (the "**Shares**").  Sellers desire to sell to Buyer, and Buyer desires to purchase from Sellers, the Shares all upon the terms and subject to the conditions set forth herein.  Therefore, the parties agree as follows with the intent to be legally bound.

## AGREEMENT

### ARTICLE I
### PURCHASE AND SALE OF SHARES; SELLER REPRESENTATIVE

1.01.   <u>Purchase and Sale of Shares on the Effective Date and at the First Closing</u>.

(a)      On the terms and subject to the conditions set forth in this Agreement, at the Effective Date the Company will sell to Buyer and Buyer will purchase from Company one (1) share of common stock in the capital of the Company for the sum of $1.00.

(b)      On the terms and subject to the conditions set forth in this Agreement, at the First Closing (as defined herein), Mr. Hara will sell, transfer and deliver to Buyer, and Buyer will purchase and accept from Mr. Hara, all of  Mr. Hara's rights, title and interest in and to 170,000 Shares held by Mr. Hara (the "**Initial Hara Shares**") which represents 8.5% of the total issued and outstanding stock of the Company, free and clear of any Liens.

(c)      In consideration for the sale and delivery to Buyer of the Initial Hara Shares, Buyer agrees to make a cash payment to Mr. Hara equal to $1,000,000 by wire transfer of immediately available funds (the "**First Closing Purchase Price**").

1.02.   <u>Purchase and Sale of Shares at Second Closing</u>.

(a)     On the terms and subject to the conditions set forth in this Agreement, at the Second Closing, the Sellers will sell, transfer and deliver to Buyer, and Buyer will purchase and accept from the Sellers, all of the Sellers' rights, title and interest in and to the Shares held by the  Sellers and identified on <u>Schedule 1.02</u> attached hereto (the "**Second Closing Shares**"), free and clear of any Liens.

(b)     In consideration for the sale and delivery to Buyer of the Second Closing Shares at the Second Closing, Buyer agrees to pay to the Sellers an aggregate purchase price of $5,000,000 (the "**Second Closing Purchase Price**") payable to the Sellers in the form and amounts as are set forth on <u>Schedule 1.02</u>.

1.03.   <u>Seller Co-Representatives</u>.

(a)     Effective as of the First Closing Date (as defined herein), each Seller, for himself and for his successors and assigns, hereby irrevocably makes, constitutes and appoints each of Mr. Hara and Mr. Berryessa to act for and on behalf of such Seller with respect to any claim or matter arising on or after the  Effective Date under the Transaction Documents (each, a "**Seller Representative**" and, together, the "**Seller Co-Representatives**"), and each of Mr. Hara and Mr. Berryessa hereby accepts such appointment.

(b)     In furtherance of the appointment of the Seller Co-Representatives, each Seller, fully and without restriction:  (i) agrees to be bound by all notices received and agreements and determinations made by and documents executed and delivered by either of the Seller Co-Representatives under the Transaction Documents; and (ii) agrees to execute a power of attorney to be provided by the Company authorizing each Seller Representative to (A) deliver to Buyer all certificates and documents to be delivered to Buyer by Sellers pursuant to the Transaction Documents, together with any certificates and documents executed by Sellers and deposited with the Seller Representative for such purpose, (B) dispute or refrain from disputing any claim made by Buyer under the Transaction Documents, (C) negotiate and compromise any dispute which may arise under the Transaction Documents, (D) pay any amounts due Buyer from Sellers under the Transaction Documents, (E) exercise or refrain from exercising any remedies available to Sellers under the Transaction Documents, (F) sign any releases or other documents with respect to any such dispute or remedy, (G) waive any condition contained in the Transaction Documents, (H) give such instructions and do or refrain from doing such other things as the Seller Co-Representatives, in their sole discretion, deem necessary or appropriate to carry out the provisions of the Transaction Documents, (I) receive all amounts payable by Buyer to Sellers under the Transaction Documents on behalf of Sellers and, subject to the Seller Representative's other responsibilities under this subsection, pay to each Seller such Seller's Pro Rata Share (as defined below) of such amounts, (J) pay out of funds coming into the hands of the Seller Representative from Buyer all fees and expenses of Sellers (and of the Seller Representative acting in such capacity) incurred in connection with the transactions contemplated by the Transaction Documents, including without limitation the fees and expenses of counsel, accountants, investment bankers and other professional advisors retained by or on behalf of Sellers in connection with such transactions, (K) retain such counsel, accountants and other professional advisors as the Seller Co-Representatives reasonably deems necessary to assist it in the performance of its duties hereunder and pay the fees, costs and expenses thereof out of the

funds coming into the hands of the Seller Co-Representatives and (L) retain out of funds coming into the hands of the Seller Co-Representatives from Buyer such amounts as the Seller Co-Representatives, in their sole discretion, deem appropriate to be held as reserves for expected or potential future expenses or liabilities of Sellers hereunder.  Except for any obligations for which Sellers are severally, but not jointly, liable, payments made by the Seller Co-Representatives under this subsection will be considered to be paid by all Sellers in accordance with their respective Pro Rata Share.

(c)     In the event of the resignation of one of the Seller Co-Representatives, or if one of the Seller Co-Representatives should die or become incapacitated, no successor will be named and the remaining Seller Co-Representative hereby agrees to act in the capacity of the Seller Representative, and in the event of the resignation, incapacity or death of such remaining Seller Representative, a successor Seller Representative will be appointed within 15 days of such event by Sellers owning a majority of the Shares immediately prior to the Second Closing.  The decisions and actions of any successor Seller Representative will be, for all purposes, those of a Seller Representative as if originally named herein.  The death or incapacity of any Seller will not terminate the authority and agency of the Seller Representative.  Any successor Seller Representative will provide Buyer with prompt written notice of its or his appointment.

(d)     Buyer will be entitled to rely exclusively upon any communication given or other action taken by the Seller Co-Representatives and will not be liable to Sellers or any other Person for any action taken or not taken in reliance upon the Seller Co-Representatives.  Buyer will not be obligated to inquire as to the authority of the Seller Co-Representatives with respect to the taking of any action that a Seller Representative takes on behalf of Sellers.

(e)     Sellers will jointly and severally indemnify each Seller Representative and hold him harmless against any and all loss, liability or expense incurred without gross negligence or bad faith on the part of such Seller Representative and arising out of or in connection with his duties as the Seller Representative.

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company and each of the Seller Co-Representatives hereby represents and warrants to Buyer as follows as of the Effective Date, as of the First Closing Date and as of the Second Closing Date, except as specifically set forth in the Disclosure Letter to be delivered separately by the Company to the Buyer within five (5) business days of the Effective Date and dated the Effective Date, and updated if necessary at least two (2) business days before each of the First Closing and Second Closing (referring to the appropriate section numbers) (the "**Disclosure Letter**"):

2.01.   <u>Organization and Qualification</u>.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of California.  The Company is duly qualified to do business as a foreign corporation and is in good standing in all jurisdictions in which the ownership of its properties or the nature of its business makes such qualification

-3-

necessary, except to the extent that the failure to be so qualified, individually or in the aggregate, has not resulted in and is not reasonably likely to result in a Material Adverse Effect, and all of such jurisdictions are listed in <u>Section 2.01</u> of the Disclosure Letter.  As used in this Agreement, "**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, operations, financial condition or prospects of the Company or (b) the ability of any Seller to perform his obligations under the Transaction Documents.  Without limiting the generality of the foregoing, a Material Adverse Effect will be deemed to have occurred if any event occurs or condition exists which results in a loss to or liability of the Company of $50,000 or more.

2.02.   <u>Power and Authority</u>.  The Company has the corporate power and authority to own its assets and to conduct its business as presently conducted and as presently planned to be conducted and to execute, deliver and perform the Transaction Documents to which it is a party.

2.03.   <u>Execution and Enforceability</u>.  This Agreement has been, and on the applicable Closing Date the other Transaction Documents to which it is a party will be, duly and validly authorized by all necessary action on the part of the Company. This Agreement has been, and on the applicable Closing Date the other Transaction Documents to which it is a party will be, validly executed and delivered by the Company and constitute (or upon such execution and delivery will constitute) legal, valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms.

2.04.   <u>No Breach, Default, Violation or Consent</u>.  Except for the Consents identified on <u>Section 2.04</u> of the Disclosure Schedule (the "**Required Consents**"), the execution, delivery and performance by the Company and the Seller Co-Representatives of the Transaction Documents to which it or he is a party do not and will not:

      (a)   violate the Company's articles of incorporation, as amended to date, or bylaws;

      (b)   materially breach or result in a material default (or an event which, with the giving of notice or the passage of time, or both, would constitute a default) under, require any Consent under, result in the creation of any Lien on the assets of the Company or Mr. Hara under or give to others any rights of termination, acceleration, suspension, revocation, cancellation or amendment of any contract, agreement, lease, license, indenture, commitment, purchase order or other legally binding business arrangement, whether written, oral or implied, relating to the Company or any of its assets (collectively, the "**Business Agreements**") or Business Permit or any material agreement to which the Company is a party or by which the Company or any of their respective assets is bound;

      (c)   breach or otherwise violate any order, writ, judgment, injunction or decree issued by any Governmental Entity (each a "**Governmental Order**") which names the Company or is directed to the Company or any of its respective assets;

      (d)   violate any law, rule, regulation, ordinance or code of any Governmental Entity (each a "**Governmental Rule**"); or

(e)     require any approval, consent, license, permit, order, ratification, waiver or authorization ("**Consent**") of, or exemption or other action by, any individual, firm, corporation, partnership, company, limited liability company, trust, joint venture, association or other entity, including any Governmental Entity ("**Person**").

2.05.   <u>Ownership and Control</u>.

(a)     The authorized capital stock of the Company consists of ten million (10,000,000) shares of common stock, of which two million (2,000,000) shares of common stock are issued and outstanding (the "**Shares**").  All Shares have been duly authorized and validly issued and are fully paid and non-assessable, and were not issued in violation of or subject to any preemptive right or other rights to subscribe for or purchase shares created by statute, the articles of incorporation of the Company or any other agreement to which the Company is a party or by which it is bound. <u>Schedule 1.02</u> sets forth the names and the number of shares held by each of the Sellers of the Company. No issued and outstanding shares of the capital stock of the Company are owned by anyone other than the Sellers. Each of the Sellers owns and has good and marketable title to all of the Shares opposite his name.  Except as set forth in <u>Section 2.05(a)</u> of the Disclosure Letter, all Shares were issued in compliance with applicable securities laws. Immediately following the Second Closing, the Buyer shall own the Shares, free and clear of all Liens.

(b)     Except as set forth in <u>Section 2.05(b)</u> of the Disclosure Letter, the Company does not have any stock option plans. Except as set forth in <u>Section 2.05(b)</u> of the Disclosure Letter, there are no outstanding (i) options, warrants, convertible securities, calls, preemptive rights, rights of first refusal, agreements or other rights to which the Company is bound obligating the Company to issue, deliver, purchase or redeem, or cause to be issued, delivered, sold, repurchased or redeemed any of the shares of the Company's capital stock (collectively, "**Rights**"), or (iii) options, warrants, sale agreements, shareholder agreements, pledges, proxies, voting trusts, powers of attorney, restrictions on transfer or other agreements or instruments which are binding on the Company and which relate to the ownership, voting or transfer of any of the Company's capital stock.

(c)     The Company does not have and has never had any subsidiaries or affiliated companies and does not otherwise own and has never otherwise owned any shares in the capital or any interest in, or control (directly or indirectly) of, any other corporation, partnership, association, joint venture or other business entity.

2.06.   <u>Financial Matters</u>.

(a)     The books of account and other financial records of the Company, all of which have been made available to Buyer, are correct and complete in all material respects, represent actual, bona fide transactions and have been maintained in accordance with sound business and accounting practices.  Each transaction is properly and accurately recorded in the books and records of the Company, and each document upon which entries in the Company's books and records are based is correct and complete in all respects.  The Company maintains an

adequate system of internal accounting controls and does not engage in or maintain any off-the-books accounts or transactions.

(b)      Attached as Section 2.06(b)(i) of the Disclosure Letter are correct and complete copies of (i) the Company's most recent unaudited balance sheets and statements of income, retained earnings and cash flows as of and for its fiscal years ended December 31, 2016 and December 31, 2017, including the footnotes thereto, and (ii) the Company's unaudited interim consolidated balance sheets and statements of income, retained earnings and cash flows as of and for the six months ended August 31, 2018 (the "**Current Financial Statements**" and, together with the items described in clause (i) above, the "**Financial Statements**").   The Financial Statements fairly present the financial condition of the Company as at the end of the periods covered thereby and the results of its operations and the changes in its financial position for the periods covered thereby, and were prepared on a cash accrual basis.

(c)      Except as and to the extent otherwise disclosed in the Current Financial Statements or on Section 2.06(c) of the Disclosure Letter, the Company has no material liabilities of any kind, whether direct or indirect, fixed or contingent or otherwise, other than (i) executory obligations under Business Agreements which are not required to be set forth in the Current Financial Statements in accordance with GAAP and (ii) liabilities incurred in the ordinary course of business since August 31, 2018 (the "**Financial Statement Date**").   As used in this Agreement, an action taken by a Person will be deemed to have been taken in the "**Ordinary Course of Business**" of such Person only if that action (A) is consistent in nature, scope and magnitude with the past practices of such Person and is taken in the ordinary course of the normal, day-to-day operations of such Person, (B) does not require authorization by the board of directors or shareholders of such Person (or by any Person or group of Persons exercising similar authority) and does not require any other separate or special authorization of any nature and (C) is similar in nature, scope and magnitude to actions customarily taken, without any separate or special authorization, in the ordinary course of the normal, day-to-day operations of other Persons that are in the same line of business as such Person.

(d)      The Company is not insolvent and will not be rendered insolvent by the consummation of the transactions contemplated by the Transaction Documents

2.07.   Tax Matters.

(a)      The Company has, duly and timely filed all federal, state and local (United States and all foreign jurisdictions) tax returns required to be filed by it ("**Tax Returns**") (unless a valid extension therefore has been granted). Each such Tax Return has been prepared in compliance with applicable law and regulations, and, except as set forth on Section 2.07(a) of the Disclosure Letter, all such Tax Returns are true, complete and correct in all material respects. The Company has duly and timely paid or made adequate provision for the payment of all taxes, assessments and other governmental charges which have been incurred by the Company as set forth in the Tax Returns or are otherwise due and payable by the Company with respect to periods ending on or prior to the Effective Date.  The Company has withheld and paid all taxes to the appropriate Governmental Entities required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contract, creditor, stockholder or

other third party. All sales taxes required to be collected and remitted by the Company with respect to periods ending on or prior to the Effective Date have been (or will be) properly collected and remitted. All necessary sales tax exemption certificates have been obtained by the Company and all such certificates have been properly completed and maintained. No Tax Return is under audit or examination by any taxing authority and there are no applications or agreements for the extension of the time for the filing of any Tax Return or for the assessment of any amounts of tax nor any consent to an extension of the period of limitations applicable to such assessment or to the collection of any tax. No issue or issues have been raised in connection with any prior inquiry into, or audit of, any tax filings of the Company which may reasonably be expected to be raised in the future by such taxing authorities and to the Company's and the Seller Co-Representatives' knowledge, no facts exist or have existed which would constitute grounds for the assessment of any further tax liabilities, which individually or in the aggregate are material. The Company has made available to the Buyer true and complete copies of all federal, state and local (United States and foreign) income Tax Returns which it has filed for each of the past three (3) fiscal years together with copies of all schedules, work papers, elections, tax depreciation schedules and other documents which were used in the preparation of each such Tax Return. There are no liens for taxes upon the assets of the Company except for liens for taxes not yet due.

(b)    There is no tax sharing agreement, tax allocation agreement, tax indemnity obligation or similar written or unwritten agreement, arrangement, understanding or practice with respect to taxes (including any advance pricing agreement, closing agreement or other arrangement relating to taxes) that will require any payment by the Company. The Company (A) has not been a member of an affiliated group within the meaning of Code Section 1504(a) (or any similar group defined under a similar provision of state, local or foreign law) and (B) has no liability for taxes of any person other than the Company under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor by contract or otherwise. The Company has disclosed on its federal income tax returns all positions taken therein that could give rise to a substantial understatement of federal income tax within the meaning of Code Section 6662.

(c)    As used herein, "**taxes**" means (a) all net income, gross income, gross receipts, sales, use, transfer, franchise, profits, withholding, payroll, employment, excise, severance, property or windfall profits taxes, or other taxes of any kind whatsoever, together with any interest, penalties or additional amounts imposed by any taxing authority (domestic or foreign).

2.08.   <u>Litigation</u>.  Except as otherwise disclosed on <u>Section 2.08(a)</u> of the Disclosure Letter, there is no pending or, to the Company's or the Seller Co-Representatives' knowledge, threatened, investigation, action, claim, demand or proceeding against the Company or its assets by or before any Governmental Entity, arbitrator, mediator or other tribunal, and neither the Company nor the Seller Co-Representatives have any knowledge of a reasonable basis for any such investigation, action, claim, demand or proceeding. <u>Section 2.08(b)</u> of the Disclosure Letter sets forth a correct and complete list of each investigation, action and proceeding (a) described in the preceding sentence or (b) in which the Company is the plaintiff or initiating party, together

with the parties thereto, the alleged basis therefor, the relief sought therein and the current status thereof.

2.09.   <u>Absence of Certain Changes and Events</u>.   Since August 31, 2018, there has not been any Material Adverse Effect.   Except as otherwise disclosed on <u>Section 2.09</u> of the Disclosure Letter, since the Financial Statement Date:

(a)   the Company has not borrowed any amount or incurred or become subject to any material liabilities, except liabilities incurred in the ordinary course of business, liabilities under contracts entered into in the ordinary course of business and borrowings from banks (or similar financial institutions) necessary to meet ordinary course working capital requirements;

(b)   the Company has not mortgaged, pledged or subjected to any Lien, any portion of its assets, except Liens for current property taxes not yet due and payable;

(c)   the Company has not sold, leased, licensed, assigned or transferred any portion of its properties or assets, or any interest therein;

(d)   the Company has not written off as uncollectible any of the Receivables, or written down the value of any of its assets or properties, except in each case in the ordinary course of business and at a rate no greater than during the 12-month period ending on the Financial Statement Date;

(e)   the Company has not suffered any material losses, waived any rights of material value or permitted any such rights to lapse;

(f)   the Company has not issued, sold or transferred any of its capital stock or other equity securities, securities convertible into its capital stock or other equity securities or warrants, options or other rights to acquire its capital stock or other equity securities or any other Rights, or any bonds or debt securities;

(g)   the Company has not declared or paid any dividends or made any distributions on the Company's capital stock or other equity securities or redeemed or purchased any shares of the Company's capital stock or other equity securities;

(h)   the Company has not made any capital expenditures or commitments exceeding $50,000 per expenditure or commitment except in the ordinary course of business;

(i)   the Company has not entered into any material agreement, contract, lease, or license outside the ordinary course of business;

(j)   the Company has not had accelerated, terminated, made modifications to, or cancelled any material agreement, contract, lease, or license involving more than $50,000 individually to which the Company is a party or by which any of them is bound;

(k)     the Company has not made any capital investment in or any loan to any Person;

(l)     the Company has not granted any license or material sublicense of any rights under or with respect to any Intellectual Property except in the ordinary course of business;

(m)     the Company has not made or authorized any change in the charter or bylaws of any of the Company;

(n)     the Company has not made any loan to, or entered into any other transaction with, any of its directors, officers, and employees outside the ordinary course of business;

(o)     the Company has not entered into any employment contract or collective bargaining agreement, written or oral, or made any modification to the terms of any existing such contract or agreement except in the ordinary course of business;

(p)     the Company has not granted any bonus to or increase in the base compensation of any of its directors, officers, and employees outside the ordinary course of business;

(q)     the Company has not adopted, amended, made any modification to, or terminated any bonus, profit-sharing, incentive, severance, or other plan, contract, or commitment for the benefit of any of its directors, officers, and employees (or taken any such action with respect to any other employee benefit plan) except as required under applicable law or in the ordinary course of business;

(r)     the Company has not made any other material change in employment terms for any of its directors, officers, and employees outside the ordinary course of business;

(s)     the Company has not cancelled, compromised, waived, or released any right or claim (or series of related rights and claims) either involving more than $50,000 individually or outside the ordinary course of business;

(t)     the Company has not entered into any other material transaction, except in the ordinary course of business;

(u)     the Company has not experienced or incurred any casualty, loss or damage with respect to any of the Company's assets, whether or not covered by insurance;

(v)     no executive officer or key employee of the Company has left his or her employment or service with the Company;

(w)     the Company has not introduced any material change with respect to its business, including without limitation with respect to the products or services it sells, the areas in

which such products or services are sold, its methods of providing such products or services, its marketing techniques or its accounting methods;

(x)     the Company has not changed any of its accounting methods or practices (including any change in depreciation or amortization policies or rates) nor revalued any of its properties or assets other than depreciation or amortization as required by GAAP and reflected in the Financial Statements; and

(y)     neither the Company nor the Sellers has entered into any agreement (in writing or otherwise) to take any actions referred to in subsections (a) through (x) above.

2.10.   [Reserved].

2.11.   <u>Constituent Documents and Governmental Rules</u>.  The Company is in compliance with (a) its charter and bylaws (correct and complete copies of which have been delivered to Buyer) and (b) all Governmental Rules applicable to the Company or its business or assets.

2.12.   <u>Governmental Orders</u>.  <u>Section 2.12</u> of the Disclosure Letter sets forth a correct and complete list of all Governmental Orders which name the Company or are directed to the Company or any of its assets, together with the governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, agency, bureau, body or entity of the United States of America or any state, country, municipality or other public subdivision located therein (each, a "**Governmental Entity**") who issued the same and the subject matter thereof.  The Company is in compliance with all such Governmental Orders.

2.13.   <u>Business Permits</u>.  <u>Section 2.13</u> of the Disclosure Letter sets forth a correct and complete list of all governmental permits, licenses, franchises, certificates, authorizations, Consents and approvals which have been obtained by the Company and are currently in effect (collectively, the "**Business Permits**") and indicates for each whether any Consent or other action is required in order for the same to remain in full force and effect following the Closing. Such Business Permits have been validly acquired, are in full force and effect and represent all governmental permits, licenses, franchises, certificates, authorizations, Consents and approvals necessary under applicable Governmental Rules for the Company to conduct its business as currently conducted and to own, occupy or use its assets.  No violations have been recorded against any such Business Permit, no citation, notice or warning has been issued by any Governmental Entity with respect to any such Business Permit, no investigation or hearing has been held by or before any Governmental Entity with respect to any such Business Permit, the Company has not received any notice from any Governmental Entity that it intends to cancel, revoke, terminate, suspend or not renew any such Business Permit and neither the Company nor the Seller Co-Representatives have any knowledge of any basis for any of the foregoing.  The Company is in compliance with all such Business Permits, except for such non-compliance as, individually or in the aggregate, is not likely to have a Material Adverse Effect.

The Company further represents and warrants that the Company has operated at all times prior to the Effective Date and shall continue operate after the Effective Date in compliance with Division 10 of the *Business and Professions Code* as well as all other California

and local laws governing business regulated by Division 10 of the *Business and Professions Code*.

Should Company convert its entity form or change its method of operation, Company shall remain in full compliance with California and local law governing commercial cannabis businesses, including the *Medicinal and Adult-Use Cannabis Regulation and Safety Act.*

2.14.   [Reserved].

2.15.   Real Property.

(a)   Section 2.15(a)(i) of the Disclosure Letter sets forth a correct and complete list of all real property owned by the Company (collectively, the "**Owned Real Property**"). Section 2.15(a)(ii) of the Disclosure Letter sets forth a correct and complete list of all leases, subleases and other material agreements or rights pursuant to which any Person has the right to occupy or use any Owned Real Property.

(b)   Section 2.15(b) of the Disclosure Letter sets forth a correct and complete list of (i) all real property leased or licensed by the Company (collectively, "**Leased Real Property**" and, together with Owned Real Property, the "**Real Property**") and (ii) all leases, subleases and other material agreements or rights pursuant to which the Company has the right to occupy or use any Leased Real Property, together with the names of the lessors or other grantors thereunder, the location of the property covered thereby, the annual rental or other consideration payable thereunder and the duration thereof, including any renewal options. All such leases are in full force and effect, are valid and effective in accordance with their respective terms, and there is not under any such leases, any existing default or event of default (or event which with notice or lapse of time, or both, would constitute a default). The Company has a valid leasehold interest in the Leased Real Property, free and clear of any Liens, any enjoys peaceful and undisturbed possession thereof.

(c)   Except as otherwise disclosed on Section 2.15(c) of the Disclosure Letter, all buildings and other improvements located on the Real Property (including without limitation all water, sewer, gas, electrical, information technology, communications and HVAC systems servicing the same) are in good repair and operating condition and are suitable for the purposes for which they are used.

(d)   All buildings and other improvements located on the Real Property, and the use of the Real Property by the Company and all Persons claiming under the Company, comply in all material respects with all Governmental Rules relating to zoning and land use and with all easements, covenants and other restrictions applicable to the Real Property.

(e)   The Real Property:  (i) is adequately serviced by all utilities necessary for the Company to conduct its business as currently conducted thereon; (ii) has adequate means of ingress and egress, either directly or by means of perpetual easements or rights-of-way which run with the Real Property; (iii) has adequate parking that is sufficient to meet the needs of the

Company's employees and business invitees and to comply with applicable Governmental Rules; and (iv) is not located in whole or in part within an area identified as a flood hazard area by any Governmental Entity.

2.16.   Personal Property; Receivables.

(a)   Section 2.16(a)(i) of the Disclosure Letter sets forth a correct and complete list of all equipment, machinery, fixtures, vehicles, computer hardware, furniture and other personal property owned, leased or used by the Company (collectively, the "**Equipment**"). Section 2.16(a)(ii) of the Disclosure Letter sets forth a correct and complete list of (i) all Equipment leased or licensed by the Company (collectively, "**Leased Equipment**") and (ii) all leases, subleases and other material agreements or rights pursuant to the Company has the right to use such Leased Equipment, together with the names of the lessors thereunder, the annual rental or other consideration payable thereunder and the duration thereof, including any renewal options. All such leases are in full force and effect, are valid and effective in accordance with their respective terms, and there is not under any such lease, any existing default or event of default (or event which with notice or lapse of time, or both, would constitute a default).

(b)   Except as otherwise disclosed on Section 2.16(b) of the Disclosure Letter, the Equipment is in good repair and operating condition and is suitable for the purposes for which it is used.  The Equipment constitutes all equipment, machinery, fixtures, vehicles, computer hardware and furniture necessary for the Company to conduct its business as currently conducted.

(c)   Except as otherwise disclosed on Section 2.16(c)(i) of the Disclosure Letter, all accounts receivable of the Company (i) represent amounts receivable for services actually provided (or, in the case of non-trade receivables, represent amounts receivable in respect of other bona fide business transactions), (ii) are valid and binding obligations due and owing to the Company in the amounts invoiced by the Company and stated in its books and records, subject to collection, (iii) are not subject to any material defenses, counterclaims or rights of setoff, (iv) have been billed and are generally due and payable within 30 days after billing, and (v) are fully collectible in the ordinary course of business except, in the case of receivables arising prior to the Financial Statement Date, to the extent of the reserves set forth in the Current Financial Statements and, in the case of receivables arising after such date, to the extent of a reasonable allowance for bad debts.  Section 2.16(c)(ii) of the Disclosure Letter sets forth the total amount of accounts receivable of the Company outstanding as of the Financial Statement Date, together with the aging of such accounts receivable, from the due date thereof, based on the following schedule:  0-30 days; 61-90 days; and over 90 days. The reserves against the accounts receivable of the Company have been established in accordance with GAAP and based upon a review of such accounts receivable, the Sellers reasonably believe such reserves to be adequate.

(d)   Section 2.16(d) of the Disclosure Letter sets forth a correct and complete list of the names and locations of all banks, trust companies, savings and loan associations and other financial institutions at which the Company maintains accounts of any nature, the type and

number of all such accounts and the names of all persons authorized to make withdrawals therefrom.

2.17.  <u>Intellectual Property</u>.

(a)  Set forth in <u>Section 2.17(a)</u> of the Disclosure Letter is a true and complete list and a brief description of all trade secrets (including recipes), trademarks, trade names, copyrights, including any registrations, applications, filings or the like relating thereto (collectively, "Intellectual Property") to which the Company owns any right, title or interest ("Owned Intellectual Property").  The Company does not license or possess any Intellectual Property of any third party except for standard off-the-shelf software licensed pursuant to shrinkwrap licenses, and the Company is not in default of any such license and does not owe any license or maintenance fees with respect to its current usage of such software except as set forth on <u>Section 2.17(a)</u> of the Disclosure Letter.  Except as disclosed in <u>Section 2.17(a)</u> of the Disclosure Letter, no rights of the Company in or to the Owned Intellectual Property conflict with or infringe upon the rights of any Person and the Company nor has not received any claim or written notice from any Person to such effect, nor does any Seller believe there is any reasonable basis for any Person to make such a claim.

(b)  There are no royalties, honoraria, fees or other payments payable by the Company or its subsidiaries to any person by reason of the ownership, use, license, sale or disposition of the Owned Intellectual Property except as set forth on <u>Section 2.17(b)</u> of the Disclosure Letter.

(c)  The Owned Intellectual Property and the Licensed Intellectual Property constitutes all the Intellectual Property used or held or intended to be used in the conduct of the businesses of the Company and its subsidiaries.

(d)  All personnel, including, but not limited to officers, employees, agents, consultants and contractors, who have contributed to or participated in the conception and development of the Owned Intellectual Property on behalf of the Company either: (i) are or have been party to a "work-for-hire" arrangement or agreement with the Company, in accordance with applicable federal and state law, that has afforded the Company full, effective, exclusive and original ownership of all tangible and intangible property thereby arising; or (ii) have executed enforceable instruments of assignment in favor of the Company as assignee that have conveyed to the Company full, effective and exclusive ownership of all tangible and intangible property thereby arising.

2.18.  <u>Title Matters</u>.  The Company has (a) good and marketable (and, in the case of any owned Real Property, fee simple) title to all assets purported to be owned by it and (b) good leasehold title to all assets purported to be leased by it, in each case free and clear of all liens, claims, security interests, pledges, charges, options, rights of first refusal, preemptive rights, mortgages, hypothecations, prior assignments, use restrictions, imperfections in title or other encumbrances of any nature whatsoever (collectively, "**Liens**").  On the Effective Date the Company's assets will be free and clear of all Liens.

2.19.   <u>Pension and Welfare Plans</u>.

(a)   <u>Section 2.19(a)</u> of the Disclosure Letter sets forth a correct and complete list of all employee benefit plans (collectively, "**Plans**").  The Company does not have any plan or commitment to establish any new Plans or to modify any existing Plans.

(b)   There are no actions, suits, claims, investigations or other proceedings pending or, to the Company's or the Seller Co-Representatives' knowledge, threatened against any Plan or related trust or any fiduciary thereof (other than routine claims for benefits). There are no outstanding Governmental Orders which name any Plan or related trust or any fiduciary thereof or are directed to any Plan or related trust, any fiduciary thereof or any assets thereof.

(c)   Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated herein, will (either alone or upon the occurrence of any additional or subsequent events) constitute an event under any Plan, trust, employment agreement or other agreement to which the Company is a party or by which the Assets are bound that will result in any payment (whether of severance pay or otherwise), acceleration, forgiveness of indebtedness, vesting, distribution, increase in benefits or obligation to fund benefits with respect to any Person.

2.20.   <u>Personnel Matters</u>.

(a)   <u>Section 2.20(a)</u> of the Disclosure Letter sets forth a correct and complete list of (i) all directors and executive officers of the Company, (ii) all other employees of or consultants or independent contractors to the Company including "outside employees" (ie. those employees who provide services directly at the customers' site) , (iii) the current job title or relationship to the Company of each such Person described in clauses (i) and (ii) above, (iv) the amount of compensation (including bonuses and commissions) paid to each such Person during the Company's fiscal year ended December 31, 2017 and which each of them is expected to receive in the Company's current fiscal year and (v) any employee benefits or perquisites available to any such Person that are not generally available to employees of the Company. To the knowledge of the Company, no Persons identified pursuant to the previous sentence have threatened to terminate his or her employment with the Company.

(b)   Except as otherwise disclosed on <u>Section 2.20(b)</u> of the Disclosure Letter, the Company is not a party to any employment, consulting or similar agreement, written or oral, with any Person.

(c)   Except as otherwise disclosed on <u>Section 2.20(c)</u> of the Disclosure Letter, (i) no employees of the Company are represented by any labor union or similar organization, (ii) the Company is not party to any collective bargaining or similar agreement covering any of its employees and (iii) no labor union or similar organization or group of employees has made a demand for recognition, filed a petition seeking a representation proceeding, given the Company notice of any intention to hold an election of a collective bargaining representative or engaged in any organizing activities at any time during the past three years.

(d)     Except as otherwise disclosed on <u>Section 2.20(d)</u> of the Disclosure Letter, (i) no strike, work stoppage, contract dispute or other labor disturbance involving any employees of the Company currently exists or, to the Company's and the Seller Co-Representatives' knowledge, is threatened and (ii) no investigation, action or proceeding by or before any Governmental Entity which relates to allegedly unfair or discriminatory employment or labor practices by the Company or the violation by the Company of any Governmental Rule relating to employment or labor practices is pending or, to Company's or the Seller Co-Representatives' knowledge, threatened.

(e)     Except as otherwise disclosed on <u>Section 2.20(e)</u> of the Disclosure Letter, the Company: (i) has complied with, and is currently in compliance with, all Governmental Rules regarding employment, including without limitation, the Equal Pay Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Civil Rights Act of 1866, Executive Order 11246, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1991, the Employee Retirement Income Security Act of 1974, the Family Medical Leave Act, the Fair Labor Standards Act and the Uniformed Services Employment and Reemployment Rights Act of 1994, including all amendments to any of the aforementioned acts and any other federal, state, or municipal fair employment and wage payment and collection statutes or laws, including but not limited to any other Governmental Rule, (ii) has withheld and reported all amounts required by law or by agreement to be withheld and reported with respect to wages, salaries and other payments to its employees, (iii) is not liable for any arrears of wages or any taxes or any penalty for failure to comply with the forgoing and (iv) is not liable for any payment to any trust or other fund governed by or maintained by or on behalf of any governmental authority, with respect to unemployment compensation benefits, social security or other benefits or obligations for its employees. To Company's and Seller Co-Representatives' knowledge, there are no unresolved claims alleging violations of such laws, regulations, rules or ordinance or for wrongful, constructive, or unlawful discharge, unlawful harassment, any claim for back pay, front pay, overtime pay, benefits, attorneys' fees, emotional distress, intentional infliction of emotional distress, assault, battery, pain and suffering, punitive or exemplary.

2.21.   <u>Insurance</u>.  <u>Section 2.21</u> of the Disclosure Letter sets forth a correct and complete list of all insurance policies of which the Company is the owner, insured, loss payee or beneficiary and indicates for each such policy any pending claims thereunder.  Except as otherwise disclosed on <u>Section 2.21</u> of the Disclosure Letter:  (a) there has been no failure to give any notice or present any material claim under any such policy in a timely fashion or as otherwise required by such policy; (b) all premiums under such policies which are due and payable have been paid in full; (c) no such policy provides for retrospective or retroactive premium adjustments; (d) the Company has not received notice of any material increase in the premium under, cancellation or non-renewal of or disallowance of any claim under any such policy; (e) the Company has not been refused any insurance, nor has its coverage been limited by any carrier; and (f) since 2015, the Company has maintained, or been the beneficiary of, general liability and product liability policies reasonable, in both scope and amount, in light of the risks attendant to its business and which provide coverage comparable to coverage customarily maintained by others in similar lines of business, and such policies have been "occurrence" policies and not "claims made" policies.

2.22.   Business Agreements.   Section 2.22 of the Disclosure Letter sets forth a correct and complete list of all Business Agreements that involve annual payments to or from the Company in an amount greater than $25,000.  The Company has delivered to Buyer accurate and complete copies of each Business Agreement listed on any Schedule hereto, and each such Business Agreement (i) is in full force and effect, (ii) constitutes a legal, valid and binding obligation of the Company and (iii) is enforceable against the Company and, to the best of the Company's and Seller Co-Representatives' knowledge, the other parties thereto, in accordance with its terms.  The Company is in compliance with each such Business Agreement in all material respects.  To the Company's and Seller Co-Representatives' knowledge, all other parties to such Business Agreements are in compliance with the terms thereof in all material respects. Except as otherwise disclosed on Section 2.22(b) of the Disclosure Letter: (i) neither the Company nor, to the Company's or Seller Co-Representatives' knowledge, any other Person thereto, has materially violated or materially breached, or declared any default or committed any material default under, any Business Agreement; (ii) no event has occurred, and no circumstance or condition exists, that might (with or without notice or lapse of time), and the execution and delivery of this Agreement and the consummation of the Transactions contemplated herein will not, (A) result in a violation or breach of any of the provisions of any Business Agreement by the Company nor, to the knowledge of the Company or Seller Co-Representatives, any other Person thereto, (B) give to the Company, nor to the knowledge of the Company or Seller Co-Representatives, any other Person thereto the right to declare or exercise any remedy under any Business Agreement, (C) give to the Company, nor to the knowledge of the Company or Seller Co-Representatives, any other Person thereto the right to accelerate the maturity of performance of any Business Agreement, or (D) give to the Company, nor to the knowledge of the Company or Seller Co-Representatives, any other Person thereto the right to cancel, terminate or modify any Business Agreement; (iv) neither the Company nor Seller Co-Representatives have received any notice or other communication (in writing or otherwise) regarding any actual, alleged, possible or potential violation or breach of, or default under, any Business Agreement; and (v) the Company has not waived any material right under any Business Agreement. There is no agreement (non-compete or otherwise) or Governmental Order to which either the Company or Seller Co-Representatives or, as applicable, their respective officers, directors or employees, is a party or otherwise binding upon the Company or Seller Co-Representatives or, as applicable, their respective officers, directors or employees, that has or reasonably could be expected to have an effect of prohibiting or impairing (i) the acquisition of the Shares by Buyer, (ii) the performance of the Company or any of the Sellers of their respective obligations under the Transaction Agreements or (iii) the conduct of the Company's business following the Closing.

2.23.   Transactions with Related Parties.  Except as otherwise disclosed on Section 2.24 of the Disclosure Letter:    (a) none of the customers, suppliers, distributors or sales representatives of the Company are Related Parties; (b) none of the Company's assets are owned or used by or leased to any Related Parties; (c) no Related Party is a party to any Business Agreement or informal arrangement with the Company, including without limitation, any loan arrangements; and (d) no Related Party provides any administrative, human resources, information technology, legal, accounting or other services to the Company.

As used in this Agreement the following terms have the following meanings:

-16-

"**Affiliate**" of a Person means any other Person who controls, is controlled by or is under common control with such Person, and "**control**" means, with respect to any Person, the direct or indirect ability to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Related Party**" means (i) any Seller, (ii) any Affiliate of the Company or any Seller, (iii) any director, officer, equity holder or immediate family member of the Company or any Seller or of any Affiliate of the Company or any Seller and (iv) any Affiliate of any Person described in clause (iii) above.

2.24.   <u>Brokers</u>.  Neither the Company nor any Seller has employed or retained, or has any liability to, any broker, agent or finder on account of this Agreement or any of the other Transaction Documents or the transactions contemplated hereby or thereby.

2.25.   <u>Delivery of Documents; Accurate Disclosure</u>.  The Seller Co-Representatives or the Company have previously delivered to Buyer correct and complete copies of each Business Permit, each Business Agreement listed on <u>Section 2.15</u> through <u>Section 2.22</u> of the Disclosure Letter and each additional agreement, document and instrument which Buyer or any of its representatives has requested in writing.  None of the information furnished by the Seller Co-Representatives or the Company to Buyer or any of its representatives in connection with this Agreement and the other Transaction Documents, and none of the representations and warranties of the Company or the Seller Co-Representatives set forth herein, in any other Transaction Document or in any certificate delivered in connection herewith or therewith, (a) is false or misleading in any material respect, (b) contains any untrue statement of a material fact or (c) omits any statement of material fact necessary to make the same not misleading.  The Sellers acknowledge and agree that the results of any due diligence investigation or examination conducted by the Buyer or its representatives shall not relieve the Sellers of their obligations with respect to the representations and warranties made by them in this Agreement or any of the other Transaction Documents, or reduce the rights of the Buyer to pursue such remedies at law or hereunder as it would otherwise have in the absence of having conducted such investigation or examination.

2.26   <u>Updating Disclosure Letter</u>.  The Company and the Seller Co-Representatives may update the Disclosure Letter prior to the Closing to reflect actions taken by Sellers or events occurring after the date of this Agreement or to make any non-material corrections to items already appearing on the Disclosure Letter, <u>provided that</u> (a) such updates shall relate only to actions taken by Sellers that are permitted pursuant to this Agreement, and (b) no such update shall be deemed to cure any breach which exists as of the date of this Agreement.

ARTICLE II.B
<u>REPRESENTATIONS AND WARRANTIES OF THE SELLERS</u>

Each Seller hereby represents and warrants on behalf of himself to Buyer as follows as of the date of this Agreement and, in the case of Mr. Hara, as of the First Closing Date and, in the case of all Sellers, as of the Second Closing Date:

-17-

2B.01. <u>Execution and Enforceability</u>. This Agreement has been, and on the applicable Closing Date the other Transaction Documents to which he or she is a party will be, duly and validly authorized by all necessary action on the part of Seller. This Agreement has been, and on the applicable Closing Date the other Transaction Documents to which he or she is a party will be, validly executed and delivered by such Seller and constitute (or upon such execution and delivery will constitute) legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms.

2B.02. <u>Ownership and Control</u>. Seller owns and has good and marketable title to all the Shares opposite his or her name in <u>Schedule 1.02</u>, free and clear of any Liens, unless otherwise set forth in Section 2B.02 of the Disclosure Letter

2B.03. <u>No Breach, Default, Violation or Consent</u>.   The execution, delivery and performance by the Seller of the Transaction Documents to which he is a party do not and will not:

(a)     materially breach or result in a material default (or an event which, with the giving of notice or the passage of time, or both, would constitute a default) under, require any Consent under, result in the creation of any Lien on the assets of the Company or such Seller under or give to others any rights of termination, acceleration, suspension, revocation, cancellation or amendment of any contract, agreement, lease, license, indenture, commitment, purchase order or other legally binding business arrangement, whether written, oral or implied, relating to the Company or such Seller or any of their respective assets (collectively, the "**Seller Business Agreements**") or Business Permit or any material agreement to which the Company or such Seller is a party or by which the Company or such Seller or any of their respective assets is bound;

(b)     breach or otherwise violate any Governmental Order which names the Company or such Seller or is directed to the Company, such Seller or any of their respective assets;

(d)     violate any Governmental Rule; or

(c)     require any Consent of, or exemption or other action by, any Person.

ARTICLE III
<u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Buyer hereby represents and warrants to Sellers and the Company as follows as of the Effective Date, as of the First Closing Date and as of the Second Closing Date:

3.01.   <u>Organization</u>.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of Nevada.. Buyer is duly qualified to do business as a foreign corporation and is in good standing in all jurisdictions in which the ownership of its properties or the nature of its business makes such qualification necessary, except to the extent that the failure to be so qualified, individually or in the aggregate, has not resulted in and is not reasonably

likely to result in a Buyer Material Adverse Effect. For purposes of this Agreement, a "**Buyer Material Adverse Effect**" means a material adverse effect on (a) the business, assets, operations, financial condition or prospects of the Buyer or (b) the ability of the Buyer to perform its obligations under the Transaction Documents; provided, however, that none of the following shall be deemed, in themselves, either alone or in combination, to constitute a Buyer Material Adverse Effect, and none of the following shall be taken into account in determining whether there has been or shall be a Buyer Material Adverse Effect: (i) any change in the market price or trading volume of the Buyer's Common Stock after the date hereof; or (ii) any adverse circumstance, change or effect resulting directly from conditions affecting the industries in which the Buyer participates in their entirety, the U.S. economy as a whole, or foreign economies as a whole in any countries where the Company or any of its subsidiaries has material operations.

3.02. <u>Power and Authority</u>.  Buyer has the corporate power and authority to own its properties and assets, to conduct its business as presently conducted and to execute, deliver and perform the Transaction Documents to which it is a party.

3.03. <u>Execution and Enforceability</u>.  This Agreement has been, and on the applicable Closing Date the other Transaction Documents to which Buyer is a party will be, duly and validly authorized, executed and delivered by Buyer and constitute (or upon such execution and delivery will constitute) legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

3.04. <u>No Breach, Default, Violation or Consent</u>.  The execution, delivery and performance by Buyer of the Transaction Documents to which it is a party do not and will not:

      (a)    violate Buyer's charter or bylaws;

      (b)    breach or result in a default (or an event which, with the giving of notice or the passage of time, or both, would constitute a default) under, require any Consent under, result in the creation of any Lien on any assets of Buyer under or give to others any rights of termination, acceleration, suspension, revocation, cancellation or amendment of any material agreement to which Buyer is a party or by which Buyer or any of its assets is bound;

      (c)    breach or otherwise violate any Governmental Order which names Buyer or is directed to Buyer or any of its assets;

      (d)    violate any Governmental Rule; or

      (e)    require any Consent, authorization, approval, exemption or other action by any Person;

except in the case of clauses (b) through (e) above, for such matters as would not, individually or in the aggregate, be likely to have a material adverse effect on Buyer's ability to perform its obligations under the Transaction Documents.

3.05.   Brokers.  Buyer has not employed or retained, and has no liability to, any broker, agent or finder on account of this Agreement or any of the other Transaction Documents or the transactions contemplated hereby or thereby, except to the extent that the Buyer is raising financing to meet its obligations under this Agreement.

3.06   Stock Consideration.  The Stock Consideration to be issued at the Second Closing will, when issued and delivered in accordance with this Agreement, be duly authorized, validly issued, fully paid and non-assessable and issued in compliance with applicable securities laws; provided, however, that the Stock Consideration to be issued hereunder will be subject to restrictions on transfer under applicable federal and state securities laws and the lock-up and leak out restrictions set forth in the Shareholders Agreement. The Stock Consideration shall bear the following legends:

UNLESS PERMITTED UNDER SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY BEFORE *[INSERT THE DATE THAT IS 4 MONTHS AND A DAY AFTER THE CLOSING DATE].*

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT") OR ANY APPLICABLE STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING SUCH SECURITIES, AGREES FOR THE BENEFIT OF THE CORPORATION THAT SUCH SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, DIRECTLY OR INDIRECTLY, ONLY (A) TO THE CORPORATION, (B) OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT AND IN COMPLIANCE WITH LOCAL LAWS AND REGULATIONS, (C) IN COMPLIANCE WITH THE EXEMPTION FROM REGISTRATION UNDER THE U.S. Securities Act PROVIDED BY RULE 144 THEREUNDER, IF AVAILABLE, AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES OR "BLUE SKY" LAWS, OR (D) IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT OR ANY APPLICABLE STATE SECURITIES LAWS, AND, IN THE CASE OF SUBPARAGRAPH (C) OR (D), THE SELLER FURNISHES TO THE CORPORATION AN OPINION OF COUNSEL OF RECOGNIZED STANDING OR SUCH OTHER EVIDENCE AS THE CORPORATION MAY REQUIRE IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE CORPORATION TO SUCH EFFECT.   DELIVERY OF THIS CERTIFICATE MAY NOT CONSTITUTE "GOOD DELIVERY" IN SETTLEMENT OF TRANSACTIONS ON STOCK EXCHANGES IN CANADA.

THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER SET FORTH IN A STOCK RESTRICTION AGREEMENT BETWEEN THE CORPORATION AND THE ORIGINAL PURCHASER OF SAID SECURITIES, A COPY OF WHICH IS AVAILABLE FOR INSPECTION AT THE CORPORATION'S OFFICES.

3.07   Securities Filings; Buyer Financial Statements.

(a)      Buyer has filed all forms, reports, registration statements and documents required to be filed by Buyer with the securities laws of the Provinces in which Buyer is a reporting issuer (the "**Reporting Provinces**") or with the Canadian Securities Exchange (the "**CSE**"), and the Buyer is not in default of its filings under, nor has it failed to file or publish any document required to be filed or published under securities laws of the Reporting Provinces or the CSE since the date of its listing on the Canadian Securities Exchange and has made available to the Company and Sellers such forms, reports, and documents in the form filed with the Reporting Provinces  or the CSE since such date.  All such required forms, reports and documents (including those that buyer may file subsequent to the date hereof) are referred to herein as the "**Buyer Securities Reports**;" provided, that any Buyer Securities Report shall be deemed to include all amendments to such report through the date hereof.  As of their respective filing dates (or if amended or superseded by a filing prior to the date of this Agreement, then on the date of such filing), the Buyer Securities Reports (i) compiled in all material respects with the requirements of the applicable Canadian and United States securities laws and regulations, as the case may be, and the rules and regulations of the applicable Canadian and United States regulatory authorities thereunder applicable to such Buyer Securities Reports and (ii) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, except to the extent corrected by subsequently filed documents with the applicable Canadian and United States regulatory authorities.

(b)      Each of the consolidated financial statements of Buyer (including, in each case, the notes thereto), included in the Buyer Securities Reports (the "**Buyer Financial Statements**"), including each Buyer Securities Report filed after the date hereof until the Closing, (i) complied as to form in all material respects with the applicable rules and regulations of the CSE with respect thereto; (ii) was prepared in accordance with IFRS applied on a consistent basis throughout the periods indicated; and (iii) fairly presented the consolidated financial position of Buyer and its subsidiaries at the respective dates thereof and the consolidated results of Buyer's operations and cash flows for the periods indicated (subject, in the case of unaudited financial statements, to audit adjustments).  There has been no change in Buyer's accounting policies during the periods covered by the Buyer Financial Statements except as described in the notes to the Buyer Financial Statements.

3.08    Litigation.  Other than as set forth in the Buyer Securities Reports, there is no action, suit or proceeding of any nature pending or to the Buyer's knowledge threatened against the Buyer, its properties or any of its officers, director or employees, nor, to the knowledge of the Buyer, is there any reasonable basis therefor the adverse result of which would have a Buyer Material Adverse Effect.

3.09    No Material Adverse Effect.  Since the date of the listing of Buyer's securities on the CSE, except as otherwise described in the Buyer Securities Reports, there has not been any Buyer Material Adverse Effect.

3.10   <u>Disclosure Letter</u>.  Buyer may provide a Buyer Disclosure Letter prior to the Closing to reflect actions taken by Buyer or events occurring after the date of this Agreement or to make any non-material corrections to items already appearing on the Disclosure Letter provided that (a) such updates shall relate only to actions taken by Buyer that are permitted pursuant to this Agreement, and (b) no such update shall be deemed to cure any breach which exists as of the date of this Agreement.

ARTICLE IV
<u>[RESERVED]</u>


ARTICLE V
<u>TRANSACTIONS PRIOR TO CLOSING</u>

5.01.   <u>Conduct of Business Prior to Closing</u>.  Except otherwise contemplated by this Agreement, or approved in writing by Buyer, between the date hereof and the First Closing Date and then between the First Closing Date and the Second Closing Date, Company will, and Sellers will cause the Company, to:

(a)   operate its business only in the ordinary course and consistent with past practice;

(b)   use its best efforts to preserve its business intact, to keep available the services of its present officers and employees and to preserve the good will of customers, suppliers and others having business relations with the Company;

(c)   maintain the Equipment in good repair and operating condition, ordinary wear and tear excepted;

(d)   maintain in full force and effect all Business Permits and insurance policies;

(e)   not enter into any contract or commitment except those made in the ordinary course of business the terms of which are consistent with past practice and reasonable in light of current conditions;

(f)   not terminate, cause the termination of, amend, renew or extend any Business Agreement unless in each case such action is in the best interest of the Company;

(g)   not waive or release any of its rights permit any of such rights to lapse;

(h)   not sell, transfer or otherwise dispose of any of its assets or any interest therein, or solicit offers in respect of or agree to do any of the foregoing, except for sales of inventory in the ordinary course of business;

(i)   not (1) incur any indebtedness for borrowed money or (2) incur, make, assume or suffer to exist any Lien, tenancy or other matter affecting title to any of its assets;

-22-

(j)    comply with applicable Governmental Rules in all material respects;

(k)    not merge or consolidate with or into, or otherwise combine with, any other Person;

(l)    take no action, and use its best efforts to prevent the occurrence of any event or the existence of any condition, which would result in any of Sellers' representations and warranties herein not being true and correct;

(m)    not (1) issue, sell, exchange or deliver any shares of its capital stock or issue or sell any securities convertible into, or options with respect to, or warrants to purchase or rights to subscribe for, any shares of its capital stock, (2) effect any recapitalization, reclassification, stock dividend, stock split or like change in its capitalization, (3) amend its articles of incorporation (or other charter documents) or bylaws, (4) declare or pay any dividends or make any distributions with respect to the Company's capital stock, or (5) make any redemption or purchase of any shares of the Company's capital stock;

(n)    promptly inform Buyer of the occurrence of any event or the existence of any condition which has had or is likely to have a Material Adverse Effect;

(o)    not make, change or revoke any tax election or make any agreement or settlement with any taxing authority; and

(p)    take no action, and use its best efforts to prevent the occurrence of any event or the existence of any condition, which would result in any of the representations and warranties of the Company or the Sellers herein not being true and correct.

5.02.   <u>No Negotiation</u>.  Neither the Company nor any of the Sellers, nor any officer, director, Affiliate or agent on behalf of any of the foregoing, will, at any time on and after the date hereof and prior to November 30, 2018, directly or indirectly, (a) enter into, or participate in, any discussions or negotiations, or solicit, entertain or encourage any inquiries or proposals, which relate to the acquisition of the Shares or the Company, or the assets, properties, business or securities of the Company (or any material portion thereof), by way of merger, reorganization, sale of assets, stock sale or exchange or otherwise by any Person (other than the Buyer) or (b) provide any non-public information to, any Person (other than the Buyer) relating to any such acquisition transaction.  Promptly upon receiving any offer or inquiry from a Person (other than the Buyer) to acquire the Shares or the Company or any of its assets, properties or securities, the Sellers will notify Buyer of such offer or inquiry, and, if requested, will provide the Buyer with all details requested by the Buyer.  The parties acknowledge and agree that there would be irreparable damage in the event that any of the provisions of this Section 5.02 are not performed in accordance with their specific terms or are otherwise breached.  Accordingly, it is agreed that the non-breaching party shall be entitled to an injunction or injunctions (or other appropriate equitable relief) to prevent breaches of this Section, and each of the parties shall have the right to specifically enforce this Section and the terms and provisions hereof against the other party in addition to any other remedy to which they may be entitled at law or in equity.  Notwithstanding

any of the foregoing, the Company and the Sellers may take any of the actions otherwise prohibited by clauses (a) and (b) above so long as they are limited to the transfer of Shares not being sold to Buyer, in a manner that does not prevent or interfere with the sale of the Shares to Buyer or the obligations of the Company or Sellers under this Agreement.

5.03.   Access to Information.  At all times prior to the applicable Closing Date Sellers will furnish, or will cause the Company to furnish, to Buyer and its representatives (a) full access during normal business hours to the properties, books and records and personnel of the Company and (b) all such information concerning the Company as any of them may reasonably request.

5.04.   Notification of Changes.  If, at any time prior to the Closing, the Company, any Seller or Buyer becomes aware that any of its or his representations or warranties set forth herein is false or misleading in any material respect, it or he will promptly notify the other party of the same.  Unless otherwise specifically agreed to by the parties in writing, no such disclosure will be considered to be an amendment to this Agreement or the Schedules hereto or will release such party from any liability arising out of such false or misleading representation or warranty.

5.05.   Commercially Reasonable Efforts.  The parties agree to use their commercially reasonable efforts to take or cause to be taken and to do or cause to be done all such actions and things as are necessary or advisable, or as may be reasonably requested by the other party, in order to consummate the transactions contemplated hereby and by the other Transaction Documents.  Without limiting the generality of the foregoing, the parties agree to take all commercially reasonable actions necessary in order to obtain any Consent or approval of any third party, including without limitation any Governmental Entity, which is required in connection with this Agreement or the other Transaction Documents or any of the transactions contemplated hereby or thereby.

ARTICLE VI
CLOSING AND CLOSING CONDITIONS

6.01.   First and Second Closing. The initial closing of the transactions contemplated hereby (the "**First Closing**") will take place as soon as practicable after the satisfaction (or waiver) of all of the conditions set forth in Sections 6.02 and 6.03. The parties anticipate that the First Closing shall take place on November 1, 2018.  The date on which the First Closing occurs is referred to herein as the "**First Closing Date**".  The second closing of the transactions contemplated hereby (the "**Second Closing**") will take place as soon as practicable after January 2, 2019 following the satisfaction (or waiver) of all of the conditions set forth in Sections 6.04 and 6.05.  The date on which the Second Closing occurs is referred to herein as the "**Second Closing Date**".

6.02.   First Closing Conditions Precedent to Obligations of Buyer.  Buyer's obligation to proceed with the First Closing and consummate the transactions contemplated by the Transaction Documents is subject to the satisfaction by the Company and/or the Seller Co-Representatives and/or Sellers, as applicable, or the written waiver of Buyer on or prior to the First Closing Date of each of the following conditions precedent:

(a)     <u>Accuracy of Representations and Warranties</u>.   The representations and warranties of the Company, the Seller Co-Representatives and/or the Sellers, as applicable, set forth herein will be true and correct on and as of the First Closing Date with the same force and effect as though made on and as of such date (other than representations and warranties made specifically with reference to a particular date, which shall have been true and correct in all respects as of such date);

(b)     <u>Performance and Compliance</u>.   The Company and Sellers will have performed or complied with each covenant and agreement required to be performed or complied with by it or them hereunder on or prior to the First Closing Date;

(c)     <u>Consents and Approvals</u>.   Sellers or the Company, as applicable, will have obtained or made each Consent, authorization, approval, exemption, filing, registration or qualification, if any, listed on any Schedule hereto or which are otherwise necessary (under applicable Governmental Rules or otherwise) for Sellers to execute, deliver and perform the Transaction Documents or, in the case of Business Permits and Business Agreements for which a Consent to a change of control is required and cannot be obtained, Buyer shall have satisfied itself that it will be able to obtain or enter into similar permits and agreements in its own name, or to otherwise obtain the benefits of such permits and agreements;

(d)     <u>Litigation</u>.   There will be no pending or threatened action by or before any Governmental Entity, arbitrator or other tribunal seeking to restrain, prohibit or invalidate any of the transactions contemplated by the Transaction Documents or seeking monetary relief against Buyer or the Company by reason of the consummation of such transactions, and there will not be in effect any Governmental Order which has such effect;

(e)     <u>Material Adverse Effect</u>.   No event will have occurred and no condition will exist which has had, or is likely to have, a Material Adverse Effect;

(f)     <u>Consulting Agreements</u>.   Each of the Persons listed on <u>Schedule 6.02(f)</u> shall have executed and delivered to the Buyer an employment agreement in a form reasonably acceptable to Buyer (the "**Employment Agreements**" and, together with the Agreement, the Shareholders Agreement, and the Second Closing Payment Notes, the "**Transaction Documents**"), containing the terms set forth therein;

(g)     <u>Buyer Financing</u>.   Buyer shall have secured the financing that it deems reasonably necessary to effect the transactions contemplated hereby; and

(h)     <u>Share Certificates</u>.   Mr. Hara will have delivered to Buyer the certificates evidencing the Initial Hara Shares, together with stock powers duly endorsed in blank.

6.03.   <u>First Closing Conditions Precedent to Obligations of Sellers</u>.   Sellers' obligation to proceed with the First Closing is subject to the satisfaction by Buyer, or the written waiver by the Seller Representative, on or prior to the First Closing Date of each of the following conditions precedent:

(a)     <u>Accuracy of Representations and Warranties</u>.   The representations and warranties of Buyer set forth herein will be true and correct on and as of the First Closing Date with the same force and effect as though made on and as of such date (other than representations and warranties made specifically with reference to a particular date, which shall have been true and correct in all respects as of such date);

(b)     <u>Performance and Compliance</u>.   Buyer will have performed or complied with each covenant and agreement to be performed or complied with by it hereunder on or prior to the First Closing Date;

(c)     <u>Consents and Approvals</u>.   Buyer will have obtained or made each Consent, authorization, approval, exemption, filing, registration or qualification, if any, necessary (under applicable Governmental Rules or otherwise) for Buyer to execute, deliver and perform the Transaction Documents;

(d)     <u>Litigation</u>.   There will be no pending or threatened action by or before any Governmental Entity, arbitrator or tribunal seeking to restrain, prohibit or invalidate any of the transactions contemplated by the Transaction Documents or seeking monetary relief against any Seller by reason of the consummation of such transactions, and there will not be in effect any Governmental Order which has such effect;

(e)     <u>Transaction Documents</u>.   Buyer and any other parties thereto (other than Sellers) will have executed and delivered to the Seller Co-Representatives each of the Transaction Documents to which Buyer is a party with the exception of the Second Closing Payment Notes.

(f)     <u>Payment of First Closing Purchase Price</u>.   Buyer will have delivered the First Closing Purchase Price in the manner set forth in Sections 1.01.

(g)     <u>Delivery of Consulting Agreements</u>.   Buyer will have approved the execution and delivery by the Company of the Consulting Agreements to the employees contemplated under Sections 6.02(f).

(h)     <u>Initial Capital Contribution</u>. Buyer will have made capital contributions to the Company in an amount equal to $1,300,000, payable by wire transfer of immediately available funds, as follows:

(i)     $300,000 within five (5) business days of the Effective Date;
(ii)    An additional $300,000 within twelve (12) business days of the Effective Date;
(iii)   An additional $700,000 on or before November 1, 2018.

The capital contributions shall be used by the Company for working capital purposes. Failure of Buyer to make a capital contribution as specified above will constitute a breach of this Agreement, unless preceded by a breach of this Agreement by the Company or Sellers.

6.04.   <u>Second Closing Conditions Precedent to Obligations of Buyer</u>.  Buyer's obligation to proceed with the Second Closing and consummate the transactions contemplated by the Transaction Documents is subject to the satisfaction by the Company and/or the Seller Co-Representatives and/or Sellers, as applicable, or the written waiver of Buyer on or prior to the Second Closing Date of each of the following conditions precedent:

(a)   <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of the Company, the Seller Co-Representatives and/or the Sellers, as applicable, set forth herein will be true and correct on and as of the Second Closing Date with the same force and effect as though made on and as of such date (other than representations and warranties made specifically with reference to a particular date, which shall have been true and correct in all respects as of such date);

(b)   <u>Performance and Compliance</u>.  The Company and Sellers will have performed or complied with each covenant and agreement required to be performed or complied with by it or them hereunder on or prior to the Second Closing Date;

(c)   <u>Consents and Approvals</u>.  Sellers or the Company, as applicable, will have obtained or made each Consent, authorization, approval, exemption, filing, registration or qualification, if any, listed on any Schedule hereto or which are otherwise necessary (under applicable Governmental Rules or otherwise) for Sellers to execute, deliver and perform the Transaction Documents or, in the case of Business Permits and Business Agreements for which a Consent to a change of control is required and cannot be obtained, Buyer shall have satisfied itself that it will be able to obtain or enter into similar permits and agreements in its own name, or to otherwise obtain the benefits of such permits and agreements;

(d)   <u>Litigation</u>.  There will be no pending or threatened action by or before any Governmental Entity, arbitrator or other tribunal seeking to restrain, prohibit or invalidate any of the transactions contemplated by the Transaction Documents or seeking monetary relief against Buyer or the Company by reason of the consummation of such transactions, and there will not be in effect any Governmental Order which has such effect;

(e)   <u>Material Adverse Effect</u>.  No event will have occurred and no condition will exist which has had, or is likely to have, a Material Adverse Effect;

(g)   <u>Share Certificates</u>.  Sellers will have delivered to Buyer the certificates evidencing the Second Closing Shares, together with stock powers duly endorsed in blank.

(h)   <u>Shareholder Agreement</u>.  Sellers will have entered into the form of Shareholders Agreement, substantially  in the form attached as Schedule 6.04(h) ("**Shareholders Agreement**").

6.05.   <u>Second Closing Conditions Precedent to Obligations of Sellers</u>.   Sellers' obligation to proceed with the Second Closing is subject to the satisfaction by Buyer, or the

written waiver by the Seller Representative, on or prior to the Second Closing Date of each of the following conditions precedent:

(a)     <u>Accuracy of Representations and Warranties</u>.  The representations and warranties of Buyer set forth herein will be true and correct on and as of the Second Closing Date with the same force and effect as though made on and as of such date (other than representations and warranties made specifically with reference to a particular date, which shall have been true and correct in all respects as of such date);

(b)     <u>Performance and Compliance</u>.  Buyer will have performed or complied with each covenant and agreement to be performed or complied with by it hereunder on or prior to the Second Closing Date;

(c)     <u>Consents and Approvals</u>.  Buyer will have obtained or made each Consent, authorization, approval, exemption, filing, registration or qualification, if any, necessary (under applicable Governmental Rules or otherwise) for Buyer to execute, deliver and perform the Transaction Documents;

(d)     <u>Litigation</u>.  There will be no pending or threatened action by or before any Governmental Entity, arbitrator or tribunal seeking to restrain, prohibit or invalidate any of the transactions contemplated by the Transaction Documents or seeking monetary relief against any Seller by reason of the consummation of such transactions, and there will not be in effect any Governmental Order which has such effect;

(e)     <u>Second Closing Payment Notes</u>.  Buyer and any other parties thereto (other than Sellers) will have executed and delivered to the Seller Co-Representatives each of the promissory notes (the "**Second Closing Payment Notes**") set forth on <u>Schedule 1.02</u>, and in the form attached hereto as <u>Schedule 6.05(e)</u>.

(f)     <u>Second Closing Payment Shares</u>.  Buyer shall cause to be delivered to the Sellers the number of shares of International Cannabrands Inc. set forth in <u>Schedule 1.02</u>.


ARTICLE VII
CERTAIN POST-CLOSING MATTERS

7.01.   <u>Access to Information</u>.  After the Effective Date, the Company agrees to make available to Buyer, for any proper purpose, any and all books and records of the Company existing on the applicable Closing Date; provided, that such access will be deemed the Company's Confidential Information subject to Section 9.02, and will be available upon reasonable prior notice, during normal business hours, at Buyer's expense and conducted in a manner so as not to unreasonably interfere with the Company's business.

7.02   <u>Further Assurances</u>.  From time to time, as and when requested by any party hereto and at such party's expense, any other party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken,

all such further or other actions as such other party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement.

7.03.   <u>Conduct of Business</u>.  Notwithstanding anything contained herein to the contrary, after the First Closing and until such time, if ever, that Buyer (or its affiliate) owns all of the issued and outstanding equity of the Company, the Company shall operate the business consistent with the Company's standard operating procedures as of the date of the Agreement, unless otherwise agreed between the Seller Co-Representatives and Buyer.  Without limiting the generality of the foregoing, each Seller Co-Representatives shall together, (in each case until his death, retirement, resignation or termination for Cause), continue to manage all aspects of the business including, without limitation, (i) determining the fees and prices charged by the Company, (ii) determining the compensation paid to employees or independent contractors of the Company, (iii) determining whether to discontinue or modify the Company's business or any program related thereto, (iv) making any decisions concerning the production, marketing, sales, capital expenditures, expenses and related matters respecting the Company and (v) making any decisions pertaining to the personnel, staffing and other resources of the Company. Notwithstanding anything to the contrary, any material changes to the Company's business operations outside the standard operating procedures as of the date of the Agreement shall be subject to Buyer's approval, which approval shall not be unreachably withheld.  As used herein, for "Cause" shall have the meaning provided in the Seller Co-Representative's Employment Agreement.

7.04.   <u>Juju Marley Product</u>. Immediately following the Closing, Buyer shall appoint the Company to be the exclusive distributor of Buyer's product known as "**Juju Marley**" in those geographic areas in the state of California serviced by the Company as of the date hereof.  As soon as practicable and in no event later than the Second Closing Date, the Company and Buyer agree to use good faith efforts to negotiate and execute a distribution agreement containing customary terms consistent with industry standards.

7.05   <u>Management Agreement; Boards of Directors</u>. As soon as practicable following the Second Closing, Buyer shall cause International Cannabrands Inc. to name either Mr. Hara or Mr. Berryessa (or their designee) to the board of directors of International Cannabrands Inc. Upon the funding of the amount under Subsection 6.03(h)(i), the number of directors of the Company will be increased to four and the Buyer shall be entitled to designate an individual to serve as a member of the board of directors of the Company. Upon the funding of the additional amounts under Subsections 6.03(h)(ii) and (iii), the Company shall accept the resignation from a member of the board of directors (other than the one designated by the Buyer) and the Buyer shall designate an additional individual to fill the vacancy created thereby. Upon the Second Closing, the number of directors of the Company will be increased to five and the additional seat will be reserved for the buyer of the remaining 49% of the Company, if and when that occurs.

7.06   <u>Working Capital Contribution</u>. Buyer will have made an additional capital contribution in respect of the securities owned by the Buyer in the Company in an amount equal to $700,000, payable by wire transfer of immediately available funds, on or before April 30, 2019. The capital contributions shall be used by the Company for working capital purposes.

ARTICLE VIII
RESERVED


ARTICLE IX
GENERAL PROVISIONS

9.01.  Assignment.   Neither this Agreement nor any right, interest or obligation hereunder may be assigned, pledged or otherwise transferred by any party, whether by operation of law or otherwise, without the prior consent of the other party or parties; provided, that (a) Buyer may assign its rights hereunder to an Affiliate so long as Buyer remains liable hereunder, and may collaterally assign its rights hereunder to any lender.

9.02.  Confidentiality.

(a)     As used in this Section the "**Confidential Information**" of a party means all information concerning or related to the business, operations, financial condition or prospects of such party or any of its Affiliates, regardless of the form in which such information appears and whether or not such information has been reduced to a tangible form, and specifically includes (i) all information regarding the officers, directors, employees, equity holders, customers, suppliers, distributors, sales representatives and licensees of such party and its Affiliates, in each case whether present or prospective, (ii) all inventions, discoveries, trade secrets, processes, techniques, methods, formulae, ideas and know-how of such party and its Affiliates, and (iii) all financial statements, audit reports, budgets and business plans or forecasts of such party and its Affiliates; provided, that the Confidential Information of a party does not include (A) information which is or becomes generally known to the public through no act or omission of the other party and (B) information which has been or hereafter is lawfully obtained by the other party from a source other than the party to whom such Confidential Information belongs (or any of its Affiliates or their respective officers, directors, employees, equity holders or agents) so long as, in the case of information obtained from a third party, such third party was or is not, directly or indirectly, subject to an obligation of confidentiality owed to the party to whom such Confidential Information belongs or any of its Affiliates at the time such Confidential Information was or is disclosed to the other party.

(b)     Except as otherwise permitted by subsection (c) below, each party agrees that it will not, without the prior written consent of the other party, disclose or use for its own benefit any Confidential Information of the other party.

(c)     Notwithstanding subsection (b) above, each of the parties is permitted to:

(i)     disclose Confidential Information of the other party to its officers, directors, employees, equity holders, lenders, agents and Affiliates, but only to the extent reasonably necessary in order for such party to perform its obligations and exercise its rights and remedies under this Agreement, and such party will take all such actions as are necessary or

desirable in order to ensure that each of such Persons maintains the confidentiality of any Confidential Information that is so disclosed;

(ii)     make additional disclosures of or use for its own benefit Confidential Information of the other party, but only if and to the extent that such disclosures or use are specifically contemplated by this Agreement;

(iii)    disclose Confidential Information of the other party to the extent, but only to the extent, required by Governmental Rules; provided, that prior to making any disclosure pursuant to this subsection, the disclosing party will notify the affected party of the same, and the affected party will have the right to participate with the disclosing party in determining the amount and type of Confidential Information of the affected party, if any, which must be disclosed in order to comply with Governmental Rules; and

(iv)    disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by the Transaction Documents and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure; provided, that such disclosure may not be made (A) until the date of the public announcement of such transactions or (B) to the extent of restrictions on disclosure which are reasonably necessary to comply to any applicable U.S. federal or state securities laws.  For purposes of this Agreement, the "tax treatment" of a transaction means the purported or claimed U.S. federal income tax treatment of such transaction and the "tax structure" of a transaction means any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of such transaction.

9.03.  Expenses.  Except as otherwise specifically provided herein or in any other Transaction Document, each party is responsible for such expenses as it may incur in connection with the negotiation, preparation, execution, delivery, performance and enforcement of the Transaction Documents ("**Transaction Expenses**"); provided, however, that Buyer shall be responsible for fifty percent (50%) of the Transaction Expenses of the Company related to the drafting and preparation of the Transaction Documents.

9.04.  Further Assurances.  The parties will from time to time do and perform such additional acts and execute and deliver such additional documents and instruments as may be required by applicable Governmental Rules or reasonably requested by any party to establish, maintain or protect its rights and remedies or to effect the intents and purposes of this Agreement and the other Transaction Documents.  Without limiting the generality of the foregoing, each party agrees to endorse (if necessary) and deliver to the other, promptly after its receipt thereof, any payment or document which it receives after the Effective Date and which is the property of the other.

9.05.  Notices.  Unless otherwise specifically provided herein, all notices, consents, requests, demands and other communications required or permitted hereunder:  (a) will be in writing; (b) will be sent by messenger, certified or registered mail, a reliable express delivery service or telecopier (with a copy sent by one of the foregoing means), charges prepaid as applicable, to the appropriate address(es) or number(s) set forth below; and (c) will be deemed to

have been given on the date of receipt by the addressee (or, if the date of receipt is not a business day, on the first business day after the date of receipt), as evidenced by (i) a receipt executed by the addressee (or a responsible person in his or her office), the records of the Person delivering such communication or a notice to the effect that such addressee refused to claim or accept such communication, if sent by messenger, mail or express delivery service, or (ii) a receipt generated by the sender's telecopier showing that such communication was sent to the appropriate number on a specified date, if sent by telecopier. All such communications will be sent to the following addresses or numbers, or to such other addresses or numbers as any party may inform the others by giving five business days' prior notice:

If to the Company:
9 Hangar Way
Watsonville, CA 95076

If to Sellers, to the Seller Co- Representatives:

Eric Hara
[address redacted]


Bryce Berryessa
[address redacted]


If to Buyer:
1045 N. Lincoln, Suite 106
Denver, CO 80203

Attention: President

9.06.   Publicity.   Neither party will make any press release or other public announcement regarding this Agreement or the other Transaction Documents or any transaction contemplated hereby or thereby until the text of such release or announcement has been submitted to the other party and the other party has approved the same; provided that either party may write a public announcement or disclosure to the extent such party is advised by counsel advisable to comply with applicable law or the rules, regulations or interpretations of the applicable electronic quotation system.

9.07.   Termination.

(a)     This Agreement may be terminated at any time prior to the First Closing or the Second Closing, as applicable:

(i)     by mutual written agreement of Buyer and the Seller Representative;

(ii)     by Buyer if there has been a material misrepresentation by the Company or Sellers hereunder, a material breach by Sellers of any of their warranties or covenants set forth herein or if any of the conditions specified in Section 6.02 have not been fulfilled within the time required and have not been waived in writing by Buyer;

(iii)     by the Company if there has been a material misrepresentation by Buyer hereunder, a material breach by Buyer of any of its warranties or covenants set forth herein or if any of the conditions specified in Section 6.03 have not been fulfilled within the time required and have not been waived in writing by the Company; or

(iv)     by Buyer or the Company if the First Closing has not occurred prior to November 30, 2018.

Except in the event of a termination pursuant to subsection 9.07(a)(iii), if this Agreement is terminated for any other reason prior to the First Closing, or the Second Closing, as applicable, the Company shall cause the capital paid by the Buyer in respect of the Shares pursuant to subsection 6.03(h), to be returned forthwith to the Buyer and in any event within sixty (60) days.

Except as noted above, if this Agreement is terminated by either the Company or Buyer as provided above, then no party will have any further obligations or liabilities hereunder except for obligations or liabilities arising from a breach of this Agreement prior to such termination or which survive such termination by their own terms.

9.08  Cannabis Law. The Parties acknowledge that marijuana is a Schedule-I controlled substance most uses of which are prohibited or heavily regulated under certain federal laws of the United States (the "**Federal Law**").  The federal government has not actively enforced the Federal Law in recent years with regard to activities made legal under applicable state law. However, even in those states in which the use and possession of marijuana has been legalized, its possession, cultivation, use, and related activities could be grounds for enforcement action under the Federal Law if enforcement policies changed.  Because this is a well-understood risk, Buyer agrees that any allegation or charge that any of the Company's current or anticipated activities involving marijuana violate Federal Law will not constitute a breach of its representations and warranties in Section 2, including those regarding compliance with law, shall not serve as "Cause" for termination of either Seller Co-Representative, or otherwise be deemed a breach of the obligations of Sellers or the Company under this Agreement, provided that such activities are compliant with applicable state and local laws.

9.09.   Miscellaneous.  This Agreement:  (a) may be amended only by a writing signed by   Buyer, each Seller Representative and the Company; (b) may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument; (c) together with the other Transaction Documents, contains the entire agreement of the parties with respect to the transactions contemplated hereby and thereby and supersedes all prior written and oral agreements, and all contemporaneous oral agreements, relating to such transactions; (d) is governed by, and will be construed and enforced in accordance with, the laws of the state of California, without giving effect to any conflict of laws rules of that or any other

jurisdiction; and (f) is binding upon, and will inure to the benefit of, the parties and their respective heirs, successors and permitted assigns.  The due performance or observance by a party of any of its obligations under this Agreement may be waived only by a writing signed by the party against whom enforcement of such waiver is sought, and any such waiver will be effective only to the extent specifically set forth in such writing.  The waiver by a party of any breach or violation of any provision of this Agreement will not operate as, or be construed to be, a waiver of any subsequent breach or violation hereof.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. All references to dollar amounts herein shall mean United States dollars.

*[Remainder of page intentionally left blank; signatures appear on following page]*

<u>SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT</u>

    IN WITNESS WHEREOF, each of the parties hereto has executed this Stock Purchase Agreement as of the date first set forth above.

**BUYER**

LVV HOLDING COMPANY LTD.    INTERNATIONAL CANNABRANDS INC.

_____    _____

By:  Steve Gormley    By:  Steve Gormley

Title:  President    Title:  President & CEO

**COMPANY**

LA VIDA VERDE, INC.

By:_____

Title:_____

**SELLERS**

_____

Eric Hara, individually and in his capacity as a Seller Representative

_____

Bryce Berryessa, individually and in his capacity as a Seller Representative

_____

Thomas Frye

_____

Brian Britton

_____

Emilio Eizner

SIGNATURE PAGE TO STOCK PURCHASE AGREEMENT

IN WITNESS WHEREOF, each of the parties hereto has executed this Stock Purchase Agreement as of the date first set forth above.

**BUYER**

LVV HOLDING COMPANY LTD.          INTERNATIONAL CANNABRANDS INC.

_____          _____

By: Steve Gormley                              By: Steve Gormley
Title: President                                Title: President & CEO

**COMPANY**

LA VIDA VERDE, INC.

By: _____
Title: _____

**SELLERS**

_____
Eric Hara, individually and in his capacity as
a Seller Representative

_____
Bryce Berryessa, individually and in his capacity as
a Seller Representative

_____
Thomas Frye

_____
Brian Britton

_____

-37-

## SCHEDULE 1.02

| Sellers | Second Closing Shares* | Value of March 31, 2019 Note** | Value of October 31, 2019 Note*** | Shares of International Cannabrands Inc.**** |
|---|---|---|---|---|
| Eric Hara | number of shares | $242,500.00 | $242,500.00 | 12,486,455 |
| Bryce Berryessa | redacted | $562,500.00 | $562,500.00 | 9,459,435 |
| Thomas Frye | | $75,000.00 | $75,000.00 | 1,261,258 |
| Brian Britton | 30,600 | $45,000.00 | $45,000.00 | 756,755 |
| Emilio Eizner | 51,000 | $75,000.00 | $75,000.00 | 1,261,258 |

*With the exception of Mr. Hara's shares, these shares represent fifty-one percent (51%) of the shares of the Company owned by each Seller and to be sold at the Second Closing. With respect to Mr. Hara, the shares owned by him to be sold in the Second Closing added to the shares sold by him in the First Closing shall represent fifty-one percent (51%) of the shares of the Company owned by him.

**Each Seller shall receive a promissory note in the principal amount described above. Each such note will accrue interest at a rate of five percent (5%) per annum and shall be due and payable no later than March 31, 2019 (Buyer may prepay these notes without penalty provided, however, that an election to prepay one note shall oblige Buyer to prepay all such notes).

*** Each Seller shall receive a promissory note in the principal amount described above. Each such note will accrue interest at a rate of five percent (5%) per annum and shall be due and payable no later than October 31, 2019 (Buyer may prepay these notes without penalty provided, however, that an election to prepay one note shall oblige Buyer to prepay all such notes).

Without the express written consent of the Buyer, each Seller shall sell no more than fifty percent (50%) of the shares issued by International Cannabrands Inc. in calendar year 2019, with the balance salable in 2020 or after.

# **SCHEDULE 6.04(h)**

## **Form of Shareholders Agreement**

# SHAREHOLDERS' AGREEMENT

**This Agreement** dated September 19, 2018, is made

AMONG:

## ERIC HARA ("**Hara**")

- and -

## BRYCE BERRYESSA ("**Berryessa**")

- and -

## THOMAS FRYE ("**Frye**")

- and -

## BRIAN BRITTON ("**Britton**")

- and -

## EMILIO EIZNER ("**Eizner**")

- and -

## LVV HOLDING COMPANY LTD. ("**LVV Holdco**")

- and -

## LA VIDA VERDE, INC. (the "**Corporation**")


# RECITALS

**WHEREAS:**

A.          The Corporation was incorporated under the *California Corporations Code* on December 7, 2017;

B.          The parties are the registered and beneficial owners of all of the issued and outstanding shares in the capital of the Corporation, as set out below:

| Name | Number of Common Shares |
|------|-------------------------|
| Hara | 990,000 |
| Berryessa | 750,000 |
| Frye | 100,000 |
| Britton | 60,000 |
| Eizner | 100,000 |
| LVV Holdco | 1 |

C.        The parties desire to enter into this agreement relating, among other things, to their securityholdings in the Corporation, their rights and duties as securityholders of the Corporation and the management and operation of the Corporation;

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.**        **INTERPRETATION**

1.1        Definitions

In this Agreement, the following words have the following meanings:

(a)    "**Affiliate**" has the meaning given in Section 150 of the CCC;

(b)    "**Agreement**" or "**hereof**" means this Unanimous Shareholder Agreement, including the Schedules to this Agreement, as it or they may be amended or supplemented from time to time;

(c)    "**Articles**" means the Articles (as defined in Section 154 of the CCC) of the Corporation as amended or restated from time to time;

(d)    "**Bank**" means the chartered bank or trust company where the Corporation maintains its accounts, as determined from time to time in accordance with the provisions of this Agreement;

(e)    "**Board**" means the board of directors of the Corporation;

(f)    "**Breach**" has the meaning assigned in subsection 12.1;

(g)    "**Business**" means the business of the Corporation which, at the date of this agreement is the manufacturing, extraction, and distribution company that produces a variety of edible and refined smoke able cannabis products for the California marketplace;

(h)    "**Business Day**" means a day other than a Saturday, Sunday or statutory holiday or any day on which banks are generally not open for business in the place where the registered office of the Corporation is located;

(i)    "**By-laws**" means the duly enacted by-laws of the Corporation, as amended from time to time in accordance with the provisions of this Agreement or the CCC;

(j)    "**CCC**" means the *California Corporations Code* as amended from time to time;

(k)    "**Closing**" means any closing of the purchase and sale of the Shares under section;

(l)    "**Common Shares**" means all of the issued and outstanding shares of common stock in the capital of the Corporation and means, in respect of each Shareholder, all the shares of common stock in the capital of the Corporation, directly or indirectly owned by that Shareholder;

(m)     "**Confidential Information**" includes, but is not limited to, any and all sales, marketing, financial, personnel, accounting, production, proprietary or other information concerning the business, products, finances or affairs of the Corporation, and all trade secrets, research, data, formulas, designs, drawings, reports, specialized know-how, methods, software, programs, processes, improvements, innovations, inventions (whether patented or not), lists or other information, papers and documents concerning the business, products, finances or affairs of the Corporation, or the specifications, materials, suppliers, customers, contracts, programs, policies or Board decisions or business plans thereof, including all matters, though not technically trade secrets, which relate directly or indirectly to the business, products, finances or affairs of the Corporation, and the definition of "Confidential Information" includes all of the foregoing whether existing on the date of this Agreement or coming into existence thereafter, and all of the foregoing in whatever form Confidential Information may be stored, recorded or processes, and extends to the paper, tape, disc, film, card or other media, goods or items on or in which Confidential Information is stored, recorded or processed.  However, Confidential Information does not include information that:

(i)     is already in the public domain at the time when the Corporation makes it available to a Shareholder;

(ii)     a Shareholder can demonstrate was already in the Shareholder's possession before it was made available to him by the Corporation;

(iii)     a Shareholder can demonstrate that he received from some third party who was not under any obligation of confidentiality to the Corporation in respect of such Confidential Information and who disclosed such Confidential Information to the Shareholder without imposing any obligation to protect its confidentiality;

(iv)     becomes, after the Corporation makes such Confidential Information available to a Shareholder, generally available to the public through publication or otherwise, unless it is the Shareholder who is, without authorization from the Corporation, directly or indirectly, the source of such disclosure or other publication;

(v)     is information or knowledge which constitutes professional expertise of the Shareholder, or the personal abilities or general know-how of the Shareholder at the time when the Shareholder first becomes a Shareholder; or

(vi)     is required by law to be made available by the Corporation to a Shareholder;

(n)     "**Control**" or "**Controlling**" is determined as set forth in the CCC;

(o)     "**Deceased Shareholder**" has the meaning assigned in subsection 8.1;

(p)     "**Disabled Shareholder**" means an individual Shareholder (or a Controlling shareholder of a corporate Shareholder) who becomes disabled, either mentally or physically, such that he is unable to perform the duties and functions regularly required of that Shareholder under his employment agreement (or consulting agreement) with the Corporation or a Subsidiary, which disability has continued for six consecutive months, or an individual Shareholder (or a Controlling shareholder of a corporate Shareholder) who is otherwise determined by the Board to be disabled;

- 4 -

(q)    "**Eligible Transferee**" means:

    (i)    in respect of a corporate Shareholder, its Controlling shareholder; and

    (ii)   in respect of an individual Shareholder:

        (A)    a corporation of which such Shareholder is the sole registered and beneficial shareholder;

        (B)    a trust of which such Shareholder (together with such Shareholder's spouse, if married) is the sole beneficiary; or

        (C)    a registered reirement savings plan maintained for the sole benefit of such Shareholder (or a transfer from such plan to such Shareholder personally);

(r)    "**Employees**" means a shareholder of the Corporation employed from time to time under section 4.1 hereof;

(s)    "**Employment Agreement**" means an agreement entered into between a shareholder of the Corporation governing the terms of employment by the Corporation, and includes the employment agreements dated October 1, 2018, between the Corporation and each of Hara and Berryessa;

(t)    "**Fair Market Value**" means, in relation to the value of the Corporation, the highest price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts, excluding any minority discounts for less than controlling interests;

(u)    "**General Offer**" has the meaning assigned in subsection 9.1;

(v)    "**Loans**" means indebtedness of the Corporation, whether for money borrowed by the Corporation or otherwise, and all interest accrued thereon;

(w)    "**Notifying Shareholder**" has the meaning assigned in subsection 13.1;

(x)    "**Preferred Shares**" means any issued and outstanding preferred shares in the capital of the Corporation and means, in respect of each Shareholder, all the preferred shares in the capital of the Corporation, directly or indirectly owned by that Shareholder;

(y)    "**Prime Rate**" means the rate of interest per annum quoted by Bank from time to time as its reference rate for demand loans made in Canadian dollars to its commercial customers in Canada and which it refers to as its "prime rate", as such rate may be changed by it from time to time;

(z)    "**Principals**" means an individual who is not a Shareholder, but who has, directly or indirectly, voting control of a corporate Shareholder, and for the purposes of this Agreement, shall be deemed to control a corporate Shareholder if he or she has fifty per

cent (50%) or more of the voting shares of a corporate Shareholder, and "**Principal**" means any one of them;

(aa) "**Pubco Shares**" has the meaning assigned in subsection 2.2;

(bb) "**Purchase Price**" means, with respect to any sale and purchase of the Shares of a Shareholder pursuant to this Agreement, the amount payable to purchase those Shares, determined in accordance with the provisions of this Agreement applicable to that sale and purchase;

(cc) "**Shareholders**" means all shareholders of the Corporation whether a holder of Common Shares or Preferred Shares, from time to time, their Eligible Transferees, for as long as they remain Shareholders of the Corporation and any other person who, from time to time, becomes a shareholder of the Corporation and a party to this Agreement, and "**Shareholder**" means any one of them; and

(dd) "**Share Purchase Agreement**" means the purchase and sale agreement dated September 19, 2018, among the Corporation, the Shareholders and International Cannabrands Inc.

1.2        Headings

The headings for sections, subsections and paragraphs in this Agreement are for convenience of reference only and do not affect the interpretation of this Agreement.

1.3        Interpretation

Whenever a singular, masculine or neuter expression or pronoun is used in this Agreement, that expression or pronoun is meant to refer to and include the plural, feminine or body corporate where required by the context.

1.4        Accounting Standards

All accounting terms not otherwise defined have the meanings assigned to them in accordance with generally accepted accounting principles applicable in Canada or International Financial Reporting Standards, as may be adopted by the Corporation from time to time.

1.5        Currency

All references to money and currency mean lawful money of Canada (unless expressed to be in some other currency) and all amounts to be paid or calculated pursuant to this Agreement are to be paid or calculated in lawful money of Canada.

1.6        Severability

If any provision of this Agreement is unenforceable or invalid for any reason whatever, such enforceability or invalidity will not affect the enforceability or validity of the remaining provisions of this Agreement and such unenforceable or invalid provisions will be severable from the remainder of this Agreement.

## 2.        SHAREHOLDER COVENANTS

2.1        Shareholders Actions

The Shareholders shall at all times do and cause to be done all acts and things and vote their Shares and otherwise exercise their respective rights, as Shareholders or otherwise, to the extent permitted by law, to cause such meetings to be held, resolutions to be passed, proxies to be executed and delivered, by-laws to be enacted or amended and documents to be executed so that at all times the provisions, conditions, restrictions and prohibitions contained in this Agreement related to their respective shareholdings in the capital of the Corporation and the business and affairs of the Corporation shall be performed and complied with.  In the event of inconsistency between this Agreement and the Articles or By-laws of the Corporation, this Agreement shall apply and the parties shall immediately make all changes to the Articles and By-laws as are necessary and lawful to render them consistent with this Agreement.

2.2        Lock-up Restriction on Sale

Each of the Shareholders who received Common Shares of International Cannabrands Inc. ("**Pubco Shares**") hereby irrevocably agrees that he will only be able to, directly or indirectly:

(a)        offer for sale, sell, pledge or otherwise dispose of (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition by any person at any time in the future of) any Pubco Shares, or any other securities convertible into or exercisable or exchangeable for any Pubco Shares which are owned as of the date of this Agreement, including, without limitation, Pubco Shares that may be deemed to be beneficially owned by the undersigned in accordance with the rules and regulations of the U.S. Securities and Exchange Commission and Shares that may be issued upon exercise of any options or warrants, or securities convertible into or exercisable or exchangeable for Pubco Shares;

(b)        enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of Pubco Shares, whether any such transaction is to be settled by delivery of Pubco Shares or other securities, in cash or otherwise;

(c)        make any demand for or exercise any right or cause to be filed a registration statement, including any amendments thereto, with respect to the registration of any Pubco Shares or any other securities convertible into or exercisable or exchangeable for any Pubco Shares; or

(d)        publicly disclose the intention to do any of the foregoing,

with regard to no more than fifty percent (50%) of the Pubco Shares he holds, if such disposition, swap, demand or disclosure occurs in calendar 2019, and with regard to no more than fifty percent (50%) of the Pubco Shares he holds if such disposition, swap, demand or disclosure occurs in calendar 2020, provided such disposition is made in accordance the applicable hold periods or restrictions under application Canadian securities laws and applicable state and federal securities laws.

The restrictions on the actions set forth in subsections 2.2(a) through (d) above shall not apply to: (i) transfers of Pubco Shares as a bona fide gift; (ii) transfers of Pubco Shares to any trust, partnership, limited liability company or other entity for the direct or indirect benefit of the undersigned or the immediate family of the undersigned; (iii) transfers of Pubco Shares to any beneficiary of the undersigned pursuant to a will, trust instrument or other testamentary document or applicable laws of descent; or (iv) transfers of Pubco Shares to any entity directly or indirectly controlled by or under common control with the  undersigned; provided that, in the case of any transfer or distribution pursuant to clause (i), (ii), (iii) or (iv) above, each donee, distributee or transferee shall sign and deliver to International Cannabrands Inc., prior to such transfer, an agreement containing restrictions substantially in the form set out herein. For purposes of this Section, "immediate family" shall mean any relationship by blood, marriage, domestic partnership or adoption, not more remote than first cousin.

2.3         Conflict with Articles or By-laws

In the event of inconsistency between this Agreement and the Articles or By-laws, this Agreement shall apply, and the Parties shall immediately make all changes to the Articles and By-laws as are necessary and lawful to render them consistent with this Agreement.


**3.**          **CONDUCT OF THE AFFAIRS OF THE CORPORATION**

3.1         The powers of the Board to manage the affairs of the Corporation under the Articles and By-laws of the Corporation, whether such powers arise from the CCC, the Articles, the By-laws or otherwise, are hereby restricted so that the following acts may only be undertaken by the Corporation with the approval of not less than 75% of all Shareholders:

(a)      the sale, lease, transfer, mortgage, pledge or other disposition of all or substantially all of the business or undertaking of the Corporation, or any of its subsidiaries;

(b)      any increase, reduction or alteration in the authorized or issued capital of the Corporation or the issue of any security or instrument containing a right to receive or acquire shares of the Corporation;

(c)      the consolidation, reorganization, merger or amalgamation of the Corporation with any other company, association, partnership or legal entity;

(d)      the taking or instituting of proceedings for the winding up, reorganization or dissolution of the Corporation;

(e)      the revocation or amendment of the Bylaws or Articles;

(f)      the change in name of the Corporation;

(g)      the repayment of loans made by Shareholders to the Corporation (unless on an equal basis, pro rata);

(h)    the payment of any dividend, bonus or other distribution to the Shareholders, (except as may be contemplated in an employment agreement for the Principals in place from time to time), or the redemption or repurchase of any Shares; and

(i)    any material changes to terms of employment between the Corporation and non-arm's length parties.

3.2    The powers of the Board to manage the day to day affairs of the Corporation under the Articles and By-laws of the Corporation, whether such powers arise from the CCC, the Articles, the By-laws or otherwise, are hereby restricted in that such matters have been delegated to Hara and Berryessa, provided Hara and Berryessa are not in breach of their respective Employment Agreement and such Employment Agreements are in effect.

3.3    Directors

The Board shall initially consist of three (3) Persons.  Each Shareholder shall vote all of its shares, and shall take all other necessary and desirable actions within such Shareholder's control (whether in its capacity as a shareholder, director, member of a board committee or officer of the Company or otherwise), and the Company shall take all necessary and desirable actions within its control (including, without limitation, calling special board and shareholders' meetings) to ensure that:

(a)    one (1) of the members of the Board shall be an individual designated by Hara, who shall initially be Eric Hara;

(b)    one (1) of the members of the Board shall be an individual designated by Berryessa, who shall initially be Bryce Berryessa;

(c)    upon the funding of the amount under Subsection 6.03(h)(i) of the Share Purchase Agreement, the number of directors of the Company will be increased to four and the Buyer shall be entitled to designate an individual to serve as a member of the board of directors of the Company. Upon the funding of the additional amounts under Subsections 6.03(h)(ii) and (iii) of the Share Purchase Agreement, the Company shall accept the resignation from a member of the board of directors (other than the one designated by the Buyer) and the Buyer shall designate an additional individual to fill the vacancy created thereby. Upon the Second Closing, the number of directors of the Company will be increased to five and the additional seat will be reserved for the buyer of the remaining 49% of the Company, if and when that occurs.

A vacancy created from time to time among the directors shall be filled in accordance with the above provisions applied *mutatis mutandis*.

3.4    Meetings of the Board

Meetings of the Board shall be held at such times as the Board shall deem fit.  The quorum for meetings of the Board will be a majority of the Board consisting of at least one of the directors designated by Hara or Berryessa, and upon the designation of a director by LVV Holdco, the quorum for meetings must also include at least one of the directors designated by LVV Holdco.

3.5    No Casting Vote

The chair of any meeting of the Board or of the Shareholders shall **not** have a second or casting vote.

3.6          Officers

The following Persons shall hold the offices of the Corporation shown below opposite their respective names:

      Chief Executive Officer – Eric Hara
      President – Bryce Berryessa
      Secretary – Bryce Berryessa.

The directors may, from time to time, appoint additional Officers in accordance with the By-laws of the Corporation, however, provided Hara and Berryessa are not in breach of their respective Employment Agreement and such Employment Agreements are in effect, the directors may not appoint another in their stead.

3.7          Execution of Instruments

All cheques, bills, notes, drafts or other instruments or documents for the purposes of binding the Corporation in connection with its accounts and transactions with the Bank and all deeds, transfers, assignments, agreements, contracts or obligations for and on behalf of and in the name of the Corporation or relating to the property of the Corporation shall be signed by two directors, or such other individual or individuals as may be authorized by the directors from time to time.

3.8          Expenses of Directors

The Corporation will pay the reasonable out-of-pocket expenses of the members of the Board incurred in connection with acting in their capacities as directors of the Corporation.

3.9          Conflicts of Interest

An officer or director who is a party to, or is a director or officer of or has a material interest in any company or business that is a party to, a material contract or proposed material contract with the Corporation or an Affiliate shall disclose in writing to the Corporation, or request to have entered in the minutes of the directors meeting, the nature and extent of his interest at the time and in the manner provided by the CCC.

3.10         Indemnification by Corporation

The Corporation shall indemnify a director or an officer, a former director or officer or a person who acts or acted at the Corporation's request as a director or an officer of an Affiliate, and his heirs and legal representatives, from and against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by him in respect of any civil, criminal or administrative action or proceeding to which he is made a party by reason of being or having been a director or officer of the Corporation or such Affiliate, if:

      (a)      he acted honestly and in good faith with a view to the best interests of the Corporation; and

      (b)      in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, he had reasonable grounds for believing that his conduct was lawful,

and as soon as practicable following the execution of this Agreement, the Corporation shall obtain directors and officers liability insurance for each of the directors and senior officers of the Corporation with coverage acceptable to the Board, acting reasonably.

## 4.        EMPLOYMENT AND MANAGEMENT MATTERS

4.1        Management Fee

The Parties agree that a Shareholder may provide certain management and consulting services to the Corporation and that, in consideration thereof, the Corporation may pay a fee in such amount as may be determined by the Board from time to time.

4.2        Non-Solicitation by Shareholder

Each Shareholder agrees not to induce or to attempt to induce or directly or indirectly to participate in the inducement of, any employee of the Corporation to breach that employee's contract of employment with the Corporation nor directly or indirectly to solicit, attempt to solicit, canvass or interfere with any Person that is or was a customer of the Corporation, in every case for so long as the Shareholder remains a shareholder of the Corporation and for a period of one (1) year following the date he or she ceases to be a Shareholder.

## 5.        GENERAL PROVISIONS RELATING TO TRANSFERS

5.1        Restrictions on Transfer

Notwithstanding any other term of this Agreement, any of the Shareholders may offer and sell Shares without the necessity of compliance with the provisions of section 7 to an Eligible Transferee so long as such Eligible Transferee enters into and agrees to be bound by this Agreement to the same extent as the Shareholder and agrees to pay any legal fees associated with such transfer.

5.2        Share Certificates

The Corporation will conspicuously mark all certificates for Shares issued to Shareholders with the following legend:

> The Corporation and the securities evidenced by this certificate are subject to, and the disposition and transfer of such securities are restricted by, a Shareholders' Agreement dated September 19, 2018, copies of which may, at the request of any Shareholder of the Corporation, be examined at the principal business office of the Corporation during normal business hours. No shares may be transferred and no disposition may be made of an interest in the securities evidenced by this certificate except in compliance with the Shareholders Agreement.

5.3        Transfers to Eligible Transferees

A Shareholder (in this Article called the "Transferor") may at any time or from time to time Transfer all of its Shares to an Eligible Transferee of the Transferor provided that, at or prior to the time of such Transfer:

(a)    the Eligible Transferee enters into an agreement in writing with the other Parties in form and substance satisfactory to them, acting reasonably, to be bound by the terms of this Agreement as if the Eligible Transferee had entered into this Agreement in the place and stead of the Transferor and to remain an Eligible Transferee of the Transferor for as long as the Eligible Transferee shall have any registered or beneficial interest in any Shares; and

(b)    the Eligible Transferee delivers to the other Parties evidence satisfactory to them, acting reasonably, that the Eligible Transferee is an Eligible Transferee of the Transferor and that the agreement referred to in subsection 5.3(a) is a legal, valid and binding obligation of the Eligible Transferee.

The Transferor shall at all times after the Transfer of any Shares to the Eligible Transferee be jointly and severally liable with the Eligible Transferee for the observance and performance of the covenants and obligations of the Eligible Transferee under this Agreement, shall cause the Eligible Transferee to remain an Eligible Transferee of the Transferor for as long as such Eligible Transferee shall have any registered or beneficial interest in any Shares and shall indemnify the other Parties against any loss, damage or expense incurred as a result of the failure by the Eligible Transferee to comply with the provisions of this Agreement.

5.4        Approval of Transfers

In respect of any transfer of Shares contemplated by or referred to in this Agreement, the Corporation agrees to approve all such transfers, and if for any reason the Board fails to approve such transfers, then, and without more, the powers of the directors in respect of the approval of that transfer are hereby restricted and abrogated and the authority to approve any and all such transfers of Shares shall vest in the Shareholders.  All Shareholders hereby agree to approve any and all of such transfers and to execute any documents or assurances that may be required to do so.

5.5        Representations and Warranties

In respect of any transfer of Shares contemplated by or referred to in this Agreement, the selling Shareholder shall be deemed to represent and warrant to the purchaser, effective as at the closing, that:

(a)    the Shares being purchased and sold are legally and beneficially owned by the selling Shareholder and are free and clear of all mortgages, liens, charges, security interests, adverse claims, pledges, encumbrances and demands of any nature whatsoever;

(b)    no person, firm or corporation has any agreement or option or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement or option for the purchase from the selling Shareholder of any of the Shares being purchased and sold; and

(c)    the purchase and sale of the Shares will not result in a breach of the provisions of any agreement, indenture, deed, debenture, mortgage bond or other document or instrument to which the selling Shareholder is a party or by which it is bound.

The said representations and warranties shall survive the closing of the transfer.


6.            OPERATIONS AND FINANCING OF THE CORPORATION

6.1            Corporate Records

The Corporation shall keep proper books of account and make entries therein of all matters, terms, transactions and things as are usually written and entered into books of account in accordance with Section 1.4.  Each Shareholder may examine and copy such books, subject to the provisions of Section 6.2.  Each Shareholder shall at all times furnish to the Board correct information, accounts and statements of and concerning all transactions pertaining to the Corporation without any concealment or suppression.

6.2            Records Confidential

Each Shareholder acknowledges that all records, material and information pertaining to the Corporation and any copies thereof obtained by any Shareholder (other than information which the Corporation is required to deliver to the Shareholders under the Act) are and shall remain the exclusive property of the Corporation.  For so long as the Corporation carries on business, each of the Parties shall keep in the strictest confidence, not disclose and not use, without the consent of the Corporation or the Shareholder to which the information relates, all non-public information pertaining to or concerning the Corporation and the Shareholders including all budgets, forecasts, analyses, financial results, costs, margins, wages and salaries, bids and other business activities, all supplier and customer lists, all non-public intellectual property including trade secrets, unfiled patents, trade-marks, technical expertise and know-how, documentation including standard terms and agreements and all other information not generally known outside the Corporation except to Persons through business dealings with the Corporation.  However, no Party shall be obliged to keep in confidence or shall incur any liability for disclosure of information which:

           (a)        was already in the public domain or comes into the public domain without any breach of this Agreement;

           (b)        is required to be disclosed pursuant to applicable laws or pursuant to policies or regulations of any regulatory authority or private or public body having jurisdiction over a Party or of which the Party is a member;

           (c)        is required to be disclosed in any valuation or legal proceeding under this Agreement; or

           (d)        is made to a professional or other adviser to such disclosing Party, in which event such disclosing Party shall, so far as reasonably possible, cause the recipient to comply with the terms of this Agreement as if it were a Party.

6.3            Accountants

The directors shall initially appoint Collins Barrow, Chartered Accountants, as Accountants.  If, in respect of any financial year of the Corporation, the Corporation otherwise qualifies for an exemption from the requirements of the Act regarding the appointment of an auditor, each Shareholder shall execute and deliver to the Corporation a written consent to such exemption in respect of that year, and the directors shall direct the Accountants to prepare such financial statements for the Corporation as may be required by the Corporation.  In any other financial year, the Corporation shall direct the Accountants to audit the financial statements of the Corporation.  The Corporation and the directors shall afford the Accountants

access to all books of account, records, vouchers, cheques, papers and documents of or which may relate to the Corporation, including those of the directors (but only to the extent that the books, records, vouchers, cheques, papers and documents relate to the Corporation).

6.4        Banking

The Corporation shall maintain one or more bank accounts at the Bank as the directors may from time to time determine.  All bank accounts shall be kept in the name of the Corporation.  All monies received from time to time for the account of the Corporation shall be paid immediately into such bank accounts for the time being in operation, in the same drafts, cheques, bills or cash in which they are received.

6.5        Financing

Additional funds required for the purposes of the Corporation shall generally be obtained from time to time through loans made by the Corporation from the Bank or another lender or lenders.  The decision as to whether such funds are required, from whom such funds will be borrowed and the terms and conditions of such borrowing shall be determined by the directors.  Each Shareholder agrees to use reasonable efforts to assist the Corporation to obtain such funds and to execute and deliver all necessary documents and statements as may be required by such bank or other lender, but no Shareholder shall be required to guarantee the indebtedness of the Corporation to any lender or other lender or to provide any other personal covenants or security for such indebtedness or to subordinate any claims that he may have against the Corporation to such indebtedness.


7.        **RIGHT OF FIRST REFUSAL**

7.1        Restriction on Transfer

Subject to section 5, a Shareholder wishing to transfer any or all of their Shares (the "Proposing Transferor") must first give notice in writing (the "Transfer Notice") to the other Shareholders of his intention to transfer in accordance with this Article.  With respect to a corporate Shareholder, a disposition of the securities of a corporate Shareholder by the party which Controls such corporate Shareholder shall constitute a transfer of Shares for the purposes of this Section 7.

7.2        Transfer Notice

The Transfer Notice:

   (a)        must specify the price (which may only be for cash) and the terms of payment upon which the Proposing Transferor is prepared to transfer the Shares;

   (b)        will constitute an offer by the Proposing Transferor to the Shareholders to sell his Shares on the terms as contained in the Transfer Notice;

   (c)        will appoint the Corporation as its or his agent for the sale thereof to any other Shareholder or Shareholders at the price and upon the terms of payment specified in the Transfer Notice, and shall include a covenant to pay for any legal costs associated with such transfer;

   (d)        must state whether or not the Proposing Transferor has had an offer to purchase the Shares or any of them from, or proposes to sell the Shares or any of them to, any

particular person who may or may not be a Shareholder and, if so, the name and addressee of such person or persons; and

(e)     will not be revocable except with the sanction of a majority of the Board.

7.3        Corporation's Acceptance

Upon receipt of the Transfer Notice, the Corporation will have a period of 15 calendar days from the date of such receipt to advise the Proposing Transferor whether the Corporation is willing to accept the offer of the Proposing Transferor to sell the Proposing Transferor's Shares at the price and upon the terms specified in the Transfer Notice.

7.4        Shareholders' Acceptance

If, upon the expiration of the 15 calendar day notice period referred to in subsection 7.3 above, the Corporation has not accepted the offer from the Proposing Transferor, the remaining Shareholders will have a period of thirty (30) Business Days from the date of such receipt to advise the Proposing Transferor whether a particular Shareholder is willing to accept the offer of the Proposing Transferor to sell the Proposing Transferor's Shares at the price and upon the terms specified in the Transfer Notice, and if so, the maximum number of Shares he is willing to purchase, including any additional Shares beyond his *pro rata* entitlement (if acceptances are not received from other Shareholders).  The number of Proposing Transferor's Shares each party accepting the offer may purchase shall be the *pro rata* amount with respect to all those parties accepting the offer.

7.5        Apportionment of Shares

If, upon the expiration of the 30 calendar day notice period referred to in subsection 7.4 above, the Board has received from the other Shareholders entitled to receive the Transfer Notice sufficient acceptances to take up the full number of Shares offered by the Transfer Notice, the Board will then apportion the Shares so offered among the Shareholders so accepting, equally *pro rata* in accordance with the number of Shares then held by them, but only up to the maximum number of Shares the Shareholder has indicated in the Transfer Notice it is willing to purchase.

7.6        Additional Shares

If not all of the Shareholders entitled to receive the Transfer Notice accept the offer in the Transfer Notice to purchase their full *pro rata* allotment, the Board will apportion the unaccepted balance of Shares so offered *pro rata* according to the number of Shares they hold among any Shareholders who have stated in their acceptance that they will purchase additional Shares beyond their *pro rata* entitlement, up to the maximum amount stated and, where there are not enough remaining Shares to fill the acceptances for additional Shares, the Board will apportion such additional Shares among them *pro rata* according to the number of Shares they then hold.

7.7        Insufficient Acceptances

If the Board has not received sufficient acceptances to take up the full number of Shares offered by the Transfer Notice, it may, but only with the consent of the Proposing Transferor (who will not be obliged to sell to the other Shareholders in the aggregate less than the total number of Shares offered by the Transfer Notice), apportion the Shares so offered among the Shareholders so accepting the offer *pro rata* in accordance with the number of Shares then held by them, but only up to the amount such Shareholders have respectively indicated they are willing to purchase.

7.8            Binding Agreement

Upon any such apportionment being made under subsection 7.5. 7.6 or 7.7, the Proposing Transferor will be bound upon payment of the Purchase Price for the Shares to transfer the Shares to the respective Shareholders to whom the Board has apportioned the Shares.

7.9            Payment

The Shareholders accepting the offer in the Transfer Notice and to whom the Board has apportioned the Shares under subsection 7.5, 7.6 or 7.7 must take up and pay for the Shares on the later of the date set out in the Transfer Notice and 15 calendar days from the date of the expiry of the 30 calendar day notice period referred to in subsection 7.4.

7.10           Failure to Transfer

If the Proposing Transferor, having become bound under Article 7 to transfer any Shares, fails to transfer any Share or Shares, the Corporation may receive the purchase money for that Share or those Shares and shall, upon receipt, cause the name of the purchasing Shareholder to be entered in the register as the holder of the Share(s) and cancel the certificate of the Share(s) held by the Proposing Transferor, whether or not the certificate is produced to the Corporation and will hold such purchase money in trust for the Proposing Transferor against delivery of the cancelled certificate or evidence acceptable to the Corporation of its loss and such indemnity or bond as the Corporation may require.  The Corporation is hereby granted a limited power of attorney to carry out, on behalf of the Proposing Transferor, the Proposing Transferor's obligations under this Article 7, including but not limited to, the right to endorse for transfer, any share certificates representing the Share or Shares.

7.11           Validity

The receipt by the Corporation of the purchase money shall be good discharge to the purchasing Shareholder and, after its name has been entered in the register, the validity of the proceedings may not be questioned by any party hereto.

7.12           Sale by Proposing Transferor

(a)            If all of the Shares offered are not accepted by the Shareholders under the preceding provisions within 30 calendar days from the date of delivery of the Transfer Notice by the Corporation to the Shareholders under subsection 7.4, and the Proposing Transferor has refused to sell less than the total number of Shares offered, the Proposing Transferor will be entitled to, subject to the provisions of section 12, for a period of 90 calendar days following the expiry of that 30 calendar day period, to sell all the Shares so offered to any person on the same terms as specified in the Transfer Notice, except for the price, which may not be less than that specified in the Transfer Notice.

(b)            If all of the Shares offered are not accepted by the Shareholders under the preceding provisions within 30 calendar days from the date of delivery of the Transfer Notice by the Corporation to the Shareholders under subsection 7.4, and the Proposing Transferor has consented to sell to Shareholders less than the total number of Shares offered by the Transfer Notice, or if any Shareholder fails to take up and pay for any Shares within the time specified in subsection 7.9, the Proposing Transferor shall be entitled to, subject to the provisions of section 12, for a period of 90 calendar days following the expiry of that 30 calendar day period to transfer, subject to approval by the Board, to any person such

of the Shares so offered as are not sold at on the same terms as specified in the Transfer Notice, except for the price, which price may not be less than that specified in the Transfer Notice.

7.13        Shares Not Sold

Any Shares not sold by the Proposing Transferor within the 90 calendar day period referred to in section 7.12 will continue to be subject to the restrictions in this Article 7.

## 8.        TRANSFER UPON DEATH OR DISABILITY

8.1        Rights to Purchase

If any individual Shareholder or Controlling shareholder of a corporate Shareholder dies during the term of this Agreement (a "Deceased Shareholder") or becomes a Disabled Shareholder; such Deceased or Disabled Shareholder (or the corporate Shareholder controlled by such Deceased or Disabled Shareholder) and each Eligible Transferee of such Shareholder (collectively, the "Vendor"), will be deemed to have given to the Corporation an irrevocable Transfer Notice under subsection 7.1 on the date of that Shareholder's death or the date the Shareholder became a Disabled Shareholder, as the case may be, constituting the offer in section 7.2(b) and making the appointment in section 7.2(c).  Notwithstanding the provisions of this section, in the event the Deceased or Disabled is Hara or Berryessa, his respective spouse shall have the first right to a transfer of the shares held by such Shareholder.

8.2        Purchase Price

For the purposes of a purchase under this section, the price for the Vendor's Shares will be the Fair Market Value of the Shares as of the date of death or disability, determined as follows:

$$\text{Price of Shares} = \frac{\text{*Number of Shares held by a Vendor}}{\text{Total Number of Shares Outstanding}} \times \begin{array}{l}\text{Fair Market} \\ \text{Value of} \\ \text{Corporation}\end{array}$$

(the "Share Purchase Price").  For greater certainty, no Shareholder shall be required to purchase the Shares, but shall have the option to do so.

8.3        Deceased Shareholder

On deemed receipt by the Corporation of a Transfer Notice under subsection 8.1, the provisions of subsections 7.3 to 7.9 inclusive will apply *mutatis mutandis*, but, if the Shareholder becomes a Deceased Shareholder, the Corporation will be deemed to have accepted the Transfer Notice (and in such case, it shall have the right to assign its rights to the surviving Shareholder).

8.4        Valuation

Unless the Fair Market Value is agreed to in writing by the Shareholders, the Corporation and the Vendor (or his personal representative) within 30 Business Days after receipt or deemed receipt of a Transfer Notice, the Corporation will engage an independent valuator (the "Valuator") to provide a determination of Fair Market Value.

8.5        Valuator

The Corporation will co-operate fully with the conduct of a valuation under this section and will provide to the Valuator access to all documents and will make available to the Valuator all personnel, accountants, lawyers, experts and other agents during normal business hours as the Valuator reasonably requires to determine the Fair Market Value.

8.6        Binding Valuation

The determination of Fair Market Value by a Valuator under this section 8 will be final and binding on all parties to this Agreement.

8.7        Fees of Valuator

The Corporation and the Shareholders that are not in agreement with the determination of Fair Value will share equally with the Corporation in the reasonable fees and expenses of a Valuator appointed under this section 8, and in the case of the purchase of Shares from a Shareholder and/or his Eligible Transferees if the Vendor is a Deceased Shareholder or a corporation controlled by a Deceased Shareholder, who is also a Principal on whose life the Corporation holds a life insurance policy, the payment will be made from the proceeds of the Life Insurance as costs of the purchase.

**9.        TAG ALONG RIGHT AND FURTHER RESTRICTIONS ON TRANSFER OR HYPOTHECATION TO THIRD PARTIES**

9.1        General Offer To Buy

In addition to the restrictions set out in section 7, no Shareholder may sell or transfer any Shares, other than pursuant to subsection 5.1 unless:

(a)        the purchaser concurrently offers to purchase all of the Shares held by all the Shareholders at the same prices and on the same conditions in relation to each class of Share (the "General Offer");

(b)        the General Offer is open for acceptance by the Shareholders for not less than 30 calendar days;

(c)        the purchaser does not purchase any Shares while the General Offer is open for acceptance; and

(d)        the purchaser completes the purchase and sale of Shares tendered under the General Offer within 10 Business Days of the expiry of the time for acceptance of the General Offer.

9.2        Failure to Purchase

If a person who has made a General Offer fails to purchase any Shares tendered under the General Offer, none of the Shareholders will sell their Shares to that person and the Corporation is not bound to record the transfer of any of those Shares to that person.

9.3        Prohibition on Pledge of Shares

Unless the transfer is to the Corporation or pursuant to subsection 5.1 or sections 7, 8 or 13, no Shareholder will sell, assign, transfer, pledge, mortgage, charge, create a security interest in, hypothecate,

option or otherwise dispose of, encumber or deal with any of their Shares, except with the prior written consent of the Board.

9.4        Completion of General Offer

Once a General Offer has been made, no Shareholder may transfer its or his Shares until the General Offer is withdrawn, completed or fails to be completed within the time required for completion.

## 10.        DRAG-ALONG RIGHT

10.1        Drag-Along Notice

If a group of Shareholders holding, in the aggregate, more than **66 2/3%** of the issued and outstanding Shares; (in each case the "Selling Shareholders") propose to sell all of their respective Shares on a cash basis, to any arm's length person, firm or corporation (a "Third Party"), and if there will be no change to the terms of remuneration under an employment agreement for any of the Selling Shareholders or any other benefit which may be received by a Selling Shareholder which is not paid equally *pro rata* by the Third Party to the other Shareholders in conjunction with the sale (other than the full or partial repayment of indebtedness or other obligations owing to the Shareholder by the Corporation), then the Selling Shareholder or Shareholders will have the right, exercisable on 30 calendar days prior written notice (the "Drag-Along Notice"), to require each of the other Shareholders to sell all of their Shares to the Third Party on the same terms and conditions, including the per share price (for each class of Share) and the date of sale, as are received by the Selling Shareholder or Shareholders under the offer from the Third Party, a copy of which will be included with the Drag-Along Notice.

10.2        Delivery of Shares

Within 30 calendar days after the receipt of the Drag-Along Notice, the other Shareholders will deliver to the designated representative of the Selling Shareholder or Shareholders a share certificate or certificates representing all of their Shares (the "Drag-Along Shares"), together with a limited power of attorney authorizing the Selling Shareholder or Shareholders to sell or otherwise dispose of the Drag-Along Shares pursuant to the terms of the offer from the Third Party.

10.3        Completion of Sale

The sale or disposition described in the Drag-Along Notice must be completed within 180 calendar days after receipt of the Drag-Along Notice.

10.4        Failure to Close

If, at the end of the 180 calendar day period referred to in section 10.3, the sale or other disposition has not been completed, then the Selling Shareholder or Shareholders will return to the other Shareholders all certificates and all powers of attorney delivered for sale under section 10.2 and each of the restrictions on sale in this Agreement with respect to Shares owned by the Selling Shareholder or Shareholders will again be in effect (unless the 180 calendar day period is extended with the consent of the other Shareholders).

10.5        Additional Compensation

If, at any time within 2 years following a sale of Drag-Along Shares, the direct or indirect remuneration paid by the Third Party to a Selling Shareholder as compensation for the Drag-Along Shares (including, without limitation, stock options or similar rights to purchase securities of the Third Party valued at the time they are issued or granted) is increased by an amount, which is more than 5% of the total that such Selling Shareholder received from the sale of his or her Shares to any Third Party, the Selling Shareholder must share such benefit equally *pro rata* with the other Selling Shareholders and the Sellers of the Drag-Along Shares and will direct the Third Party to pay such direct or indirect remuneration directly to the other Selling Shareholders and sellers of the Drag-Along Shares.  For greater certainty, this clause shall not apply to a Selling Shareholder who becomes an employee of the Third Party and such compensation is fairly characterized within the course of the Selling Shareholder's employment with the Third Party.

## 11.        PRE-EMPTIVE RIGHTS

11.1        Offer to Purchase

Before allotting any new Shares in its capital, the Corporation must offer those Shares *pro rata* to the Shareholders (the "Offer") by written notice to the Shareholders to their last address on the records of the Corporation in accordance with section 14 (the "Notice").

11.2        Notice

The Notice must specify the number of Shares offered, the price for the Shares and the time for acceptance which will not be less than 10 Business Days from the day the Notice is given.

11.3        Issuance of Shares

After the expiration of the time for acceptance of the Offer or on receipt of written confirmation from the Shareholders to whom the offer is made that they decline to accept the Offer, and where there are no Shareholders holding Shares who should first receive an Offer, the Corporation may, for 90 calendar days thereafter, offer Shares to the persons and in the manner it thinks most beneficial to the Corporation; but the offer to those persons shall not be at a price less than, or on terms more favourable than, the Offer to the Shareholders.

11.4        Waiver

A Shareholder may, by instrument in writing, waive the right to be offered any specified allotment of Shares, but a Shareholder may not waive generally his right to be offered Shares as referred to in subsection 11.1.

11.5        Stock Option Plan Exempt

The provisions of Article 11 shall not apply to any Shares or options issued to employees of the Corporation pursuant to the Corporation's employee stock option plan.

## 12.        DEFAULT

12.1         Breach

If any of the following events occurs in respect of a Shareholder (and in relation to a corporate Shareholder, "Shareholder" shall refer to the corporation itself and to its Controlling shareholder) (each a "Defaulting Shareholder") (the other Shareholders being "Non-Defaulting Shareholders") it shall be considered a default of this Agreement (a "Breach") by the Defaulting Shareholder:

(a)        if a Shareholder fails to observe, perform or carry out any of the obligations hereunder and such failure continues for 30 calendar days after the Notifying Shareholder has in writing demanded that such failure be cured under subsection 13.1;

(b)        if a Shareholder discloses material Confidential Information (as determined by the Board) about the Corporation to any person, firm, corporation or other entity which provides services substantially similar to those services provided by the Corporation;

(c)        if a Shareholder has proceedings instituted against it for the its dissolution or winding-up (if a corporate Shareholder) or has a certificate of dissolution issued with respect to it (if a corporate Shareholder) or such corporate Shareholder is otherwise dissolved and its corporate status terminated in its jurisdiction of incorporation;

(d)        if a Shareholder becomes a bankrupt or is adjudged to have committed an act of bankruptcy or makes an assignment for the benefit of creditors or otherwise;

(e)        if a Shareholder has a receiver, receiver manager or other person with similar powers appointed in respect of all or substantially all of the property of a Shareholder unless the same is diligently and *bona fide* opposed and security satisfactory to the other Shareholders (acting reasonably) is posted;

(f)        if a Shareholder has any if its Shares seized or attached in any way for the payment of any judgment or order;

(g)        if a Shareholder becomes a mentally incompetent person or a missing person, both as defined in applicable laws, or becomes a dependent adult under applicable laws, or is the subject of any similar or equivalent adjudication any jurisdiction;

(h)        if an application or proceeding under matrimonial legislation is commenced by a Shareholder (or the Controlling shareholder of a corporate Shareholder) or the spouse, former spouse or dependent of a Shareholder (or the Controlling shareholder of a corporate Shareholder) to determine the entitlement of such spouse, former spouse or dependent to a payment in respect of the net family property of such Shareholder (or the Controlling shareholder of a corporate Shareholder) or to support from such Shareholder (or the Controlling shareholder of a corporate Shareholder) (in each case, the "Relevant Shareholder"); and the Relevant Shareholder shall not have produced evidence reasonably satisfactory to the Board within thirty (30) calendar days of the date on which such application or proceeding is commenced that the claims of such spouse, former spouse or dependent to such payment or support can be settled without, in any way, directly or indirectly, affecting, encumbering or interfering with the holding or voting of Shares by the Relevant Shareholder; or

- 21 -

   (i)  if a Shareholder effects any other transfer, sale, assignment, transmission, bequest, inheritance, mortgage, encumbrance or other disposition of Shares having the result (directly or indirectly and either immediately or subject to the happening of any contingency) of changing the identity of any Shareholder (or any Controlling shareholder of a corporate Shareholder, from the Controlling shareholder exercising control of such corporate Shareholder) as of the date of execution of this Agreement unless otherwise permitted pursuant to the provisions of this Agreement.

12.2   Actions Following Breach

12.3   Upon the occurrence of a Breach, the Non-defaulting Shareholders may do any one or more of the following:

   (a)  pursue any remedy available to the Non-Defaulting Shareholders in law or equity, it being acknowledged by each of the Shareholders that specific performance, injunctive relief (mandatory or otherwise) or other equitable relief may be the only adequate remedy for a Breach;

   (b)  take all actions in their own names or in the name of the Defaulting Shareholder or the Corporation as may reasonably be required to cure the Breach, in which event all payments, costs and expenses incurred therefor will be payable by the Defaulting Shareholder to the Non-Defaulting Shareholders on demand with interest;

   (c)  implement the Buy-Out of Defaulting Shareholder Procedure as set out in the following section; or

   (d)  waive the Breach provided, however, that any waiver of a particular Breach will not operate as a waiver of any subsequent or continuing Breach.

## 13.   BUY-OUT OF DEFAULTING SHAREHOLDER

13.1   Default Notice

If a Shareholder has committed a Breach, any other Shareholder (the "Notifying Shareholder") may give to the Defaulting Shareholder notice of default (the "Default Notice").

13.2   Remedy

On receipt of a Default Notice, the Defaulting Shareholder will have 30 calendar days to remedy or cure the Breach.  Whether a Breach has been remedied or cured will be determined by majority vote of the Board provided that if the Defaulting Shareholder (or its Controlling shareholder, if a corporate Shareholder) is a director, he or she shall not have the right to vote.

13.3   Failure to Cure

If the Breach of a Defaulting Shareholder has not been substantially cured to the satisfaction of the Board in accordance with section 13.2 and within the period referred to in subsection 13.2, the Notifying Shareholder may give to the Defaulting Shareholder and each Non-Defaulting Shareholder notice of its intention to purchase the Shares of the Defaulting Shareholder (the "Purchase Notice") and, on receipt of the Purchase Notice, the Defaulting Shareholder will be bound to sell its Shares on the terms set out in

this section.  The Shares of the Defaulting Shareholder shall include all Shares held by the Defaulting Shareholder's respective Eligible Transferees.

13.4        Purchase Price

The price for the Shares of the Defaulting Shareholder shall be the price per share determined by multiplying 95% of the Fair Market Value of the Corporation as at the date the Purchase Notice is received by the Defaulting Shareholder, determined pursuant to subsection 13.14 by a fraction, the numerator of which is the number of Shares of the Defaulting Shareholder and the denominator of which is the total number of issued Shares of the Corporation. The Notifying Shareholder will pay the Purchase Price for the Shares in cash by certified cheque, bank draft, solicitors trust cheque or other method of providing immediately available funds.

13.5        Non Application

The provisions of sections 7 and 9 will not apply to a sale of Shares of a Defaulting Shareholder under this section, and after receipt of a Default Notice, a Defaulting Shareholder may not implement the sale procedure in section 7 and the purchase and sale of Shares pursuant to a sale procedure then underway may not be completed until the Breach has been substantially cured within the period referred to in subsection 13.2 or until the Default Notice is withdrawn.

13.6        Notice to Purchase

Within 10 Business Days following receipt of the Purchase Notice, each of the Non-Defaulting Shareholders may give notice in writing to the Corporation that it wishes to purchase Shares of the Defaulting Shareholder and the maximum number of Shares that it will purchase including any additional Shares which he wishes to purchase beyond his *pro rata* entitlement.

13.7        Apportionment of Shares

The Notifying Shareholder will apportion the Shares to be purchased among the Non-Defaulting Shareholders giving notice under subsection 13.6 as nearly as possible *pro rata* according to the number of Shares they then hold in the Corporation, subject to the maximum number of Shares that each Non-Defaulting Shareholder indicates it will purchase, and will notify the Non-Defaulting Shareholders of the allocation within two Business Days of the expiry of the period set out in subsection 13.5.

13.8        Unclaimed Shares

If one or more of the Non-Defaulting Shareholders does not elect to purchase his full *pro rata* entitlement to the Shares of the Defaulting Shareholder, the Notifying Shareholder will apportion the Shares not taken up (the "Unclaimed Shares") among any Non-Defaulting Shareholders who have given notice that they wish to purchase additional Shares beyond their *pro rata* entitlement, up to the maximum amount stated in such notices, and, where there are not enough Unclaimed Shares to fill the notices for the purchase of additional Shares, the Notifying Shareholder will apportion the Unclaimed Shares among such Non-Defaulting Shareholders *pro rata* according to the number of Shares they then hold.

13.9        Closing

The Closing of the purchase and sale of the Shares of the Defaulting Shareholders will be made within 20 Business Days of the expiry of the period set out in subsection 13.6.

13.10          Failure to Pay

If any of the Non-Defaulting Shareholders fails to tender payment for any Shares at the Closing, the Notifying Shareholder will have the right to purchase such Shares or may allocate such Shares to the Non-Defaulting Shareholders as if they were Unclaimed Shares pursuant to subsection 13.8.

13.11          Transfer Of Shares

At the Closing the Defaulting Shareholder will execute and deliver to the Notifying Shareholder all transfer documents necessary to transfer his Shares to the Notifying Shareholder (or any assignee the Notifying Shareholder may designate) free and clear of all charges, liens and encumbrances, and until the execution and delivery thereof, the Defaulting Shareholder shall not be entitled to any benefits under this Agreement including the right to receive the Purchase Price for his Shares.

13.12          Termination of Rights

From and after the Closing all rights of the Defaulting Shareholder under this Agreement, except for those contained in this section, will terminate and be at an end.

13.13          Assignment

The Notifying Shareholder is entitled to assign to any one or more other Shareholders any part or all of its rights to purchase the Shares of the Defaulting Shareholder without the consent of the Defaulting Shareholder in such manner and upon such terms as the Notifying Shareholder in its sole discretion determines to be appropriate.

13.14          Valuation

Unless the Fair Market Value is agreed to by the Defaulting Shareholder and the Non-Defaulting Shareholders, the Corporation will on the date the Purchase Notice is given pursuant to subsection 13.3, engage a qualified independent chartered business valuator to provide a determination of Fair Market Value on or before the date for closing in subsection 13.9.

13.15          Cooperation

The Corporation will co-operate fully with the conduct of a valuation under this section and will provide to the valuator access to all documents and will make available to the valuator all personnel, accountants, lawyers, experts and other agents during normal business hours as the valuator reasonably requires to determine the Fair Market Value.

13.16          Value Conclusive

The determination of Fair Market Value by a valuator under this section 13 will be final and binding on all parties to this Agreement.

13.17          Payment of Fees

The Corporation and the Defaulting Shareholder will each pay 50% of the reasonable fees and expenses of the valuator appointed pursuant to subsection 13.14.

14.          **CONFIDENTIALITY**

14.1          Confidential Information

Each Shareholder agrees that:

     (a)     the Shareholder shall hold all Confidential Information in trust and for the use and benefit of the Corporation.  The Shareholders shall ensure that Confidential Information shall not be disclosed, except as provide for in subsection 14.1(b);

     (b)     the Shareholder shall not, except:

          (i)     with the prior written consent of the Board;

          (ii)     if the Shareholder is required to disclose by law or by an order of any government body, court, tribunal or authority having jurisdiction over the Shareholder; or

          (iii)     insofar as may be reasonably necessary in the course of performing the Shareholder's duties on behalf of the Corporation in a case where a Shareholder is also a director, officer or employee of, or an authorized agent acting on behalf of the Corporation;

          directly or indirectly, reproduce, take, remove, disclose to any person or use for any purpose not related to the business of affairs of the Corporation, any Confidential Information; and

     (c)     the Shareholder shall deliver to the Corporation on demand the originals and all copies of any Confidential Information which are in the possession of the Shareholder or under the Shareholder's control, including any papers, drawings, plans, records, documents, discs, tapes, films, cards or other recording media or other goods or items containing or incorporating any Confidential Information, and all other property of any kind or nature of the Corporation.

14.2          Disclosure

Each Shareholder agrees that:

     (a)     in the course of carrying on its business, from time to time the Corporation creates, has, acquires or controls Confidential Information and the Corporation makes available the Confidential Information to the Shareholder for use in relation to the business and affairs of the Corporation, but for no other purpose;

     (b)     Confidential Information constitutes a valuable part of the Corporation's property;

     (c)     the disclosure of Confidential Information to persons not authorized by the Board to receive same, including competitors of the Corporation, former directors, officers or employees of the Corporation, or members of the general public, may be highly detrimental to the best interests of the Corporation; and

(d)    it would be difficult to measure the damage to the Corporation flowing from any breach by the Shareholder of the provisions set forth in section 14.1(a) and that money damages would therefore be an inadequate remedy for such breach.

14.3        Breach

Having regard to section 14.2, each Shareholder agrees that if he or it breaches any provision section 14.1, the Corporation shall be entitled, in addition to all other remedies the Corporation may have, to an injunction or other appropriate court order or order of another government body, tribunal or authority having jurisdiction (whether in law or by virtue of this Agreement) over the Shareholder, so as to restrain any such breach by the Shareholder, without the Corporation showing or proving any actual damage sustained by the Corporation.

## 15.       NOTICE

15.1        Notices

All notices and other communications required or permitted pursuant to or in relation to this Agreement shall be in writing and shall be:

(a)    personally served upon the addressee or an officer or director of a corporate addressee, in which case such notice or other communication shall conclusively be deemed to have been given to the addressee at the time of such service; or

(b)    sent by postage prepaid first class mail addressed to the addressee as listed as its most current address in the minute book of the Corporation, in which case such notice or other communication shall conclusively be deemed to have been given to the addressee upon the expiration of the 7th calendar day, excluding Saturdays, Sundays and statutory holidays, free from interruption in the postal service from the date of mailing.  If the postal service is interrupted due to a strike, lockout or other cause, whether at the time of such mailing or during the said period of 7 calendar days from the date of mailing, service of such notice or other communication shall not be effective unless given in accordance with the provisions of subsection 15.1.

## 16.       GENERAL

16.1        Relationship of the Parties

Nothing in this Agreement will be deemed to constitute any Shareholder as a partner of or joint venturer with another Shareholder, nor, except as otherwise expressly provided herein, the agent or legal representative of another Shareholder, nor to create any fiduciary relationship between the Shareholders.

16.2        Obligations Joint and Several

The rights, duties, obligations and liabilities of the parties are several and not joint or collective.

16.3        Time

Time is of the essence of this Agreement.

16.4            Amendment

No amendment of this Agreement will be effective unless made in writing and signed by the Parties.

16.5            Terms of Agreement

Subject to the terms and conditions of this Agreement, the rights and obligations of a Shareholder under this Agreement shall terminate at such time as such Shareholder is no longer the beneficial owner of any Shares.  This Agreement shall terminate upon any one of the following events occurring:

>        (a)        the bankruptcy of the Corporation or upon the winding up or dissolution of the Corporation; or
>
>        (b)        the execution of any agreement of termination in writing by all of the parties hereto.

16.6            Further Assurances

The parties agree to make, execute and deliver any and all further assurances or other documents necessary to give full force and effect to the meaning and intent of this Agreement.

16.7            Arbitration

All disagreements arising among any Shareholders or between any Shareholder(s) and the Corporation with respect to this Agreement or any matter arising hereunder shall be finally settled by arbitration, by which each Shareholder and the Corporation agrees to be bound. Such arbitration shall be conducted by a single arbitrator in accordance with the *Arbitration Act (Alberta)*.  All arbitrations shall be conducted in Calgary, Alberta or at such other place as the Shareholders may from time to time agree upon.

16.8            Applicable Law

This Agreement shall be subject to and governed by the laws of Alberta.  The parties hereto agree to attorn to the exclusive jurisdiction of the courts of Alberta.

16.9            Revocation of Previous Agreements

The parties hereto revoke all previous agreements, written or oral, into which they have entered respecting the Shares of the Corporation.

16.10            Precedence Over Corporation's Articles And Bylaws

As between the Shareholders and the Corporation, the provisions of this Agreement will take precedence over the provisions of the Articles and By-laws of the Corporation.

The parties hereto agree to do all acts and things reasonably necessary to effect compliance with or waiver of the restrictions on the transfer of Shares contained in the Articles and By-laws of the Corporation to give effect to any transfer or intended transfer of Shares required or permitted to be made and recorded as a result of the application of the provisions of this Agreement in order that, notwithstanding such restrictions, the terms and conditions of this Agreement may be carried out.

- 27 -

16.11        Assignment Restricted

Except as otherwise expressly provided herein, neither this Agreement nor any of the rights, privileges or advantages granted by this Agreement to any of the parties hereto shall be capable of assignment by any party hereto without the prior express written consent of the other parties hereto.

16.12        Non-Waiver

If a party to this Agreement overlooks, waives or condones a breach, default or non-observance of this Agreement by another party, it will not relieve the other party from or constitute a waiver or condonation of any continuing or subsequent default, breach or non-observance of this Agreement.

16.13        Enurement

This Agreement enures to the benefit of and is binding upon the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

16.14        Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior negotiations, undertakings, representations and understandings between such parties.

16.15        Scope of Directors' Rights, Duties, Powers and Obligations

This Agreement constitutes a written agreement among all of the shareholders of the Corporation restricting the powers of the directors to manage or supervise the management of the business and affairs of the Corporation.  Accordingly, to the extent set out herein, the directors are hereby relieved of their rights, duties, powers and obligations as directors with respect to the management of the business and affairs of the Corporation and to the extent set out herein, such rights, duties, powers and obligations are hereby assumed by the Shareholders.

16.16        Counterpart Execution

This Agreement may be executed and delivered in counterparts with the same effect as if all parties had executed and delivered the same copy, and when each party has executed and delivered a counterpart, all counterparts together shall constitute one Agreement.

*[remainder of page intentionally left blank]*

**IN WITNESS** of this Agreement, the parties have executed and delivered this Agreement as of the date given above.

**LA VIDA VERDE, INC.**                    **LVV HOLDING COMPANY LTD.**

By:

_____
Authorized Signatory

SIGNED, SEALED AND DELIVERED by in
the presence of:

_____          _____
Name                                       ERIC HARA


SIGNED, SEALED AND DELIVERED by in
the presence of:

_____          _____
Name                                       BRYCE BERRYESSA


SIGNED, SEALED AND DELIVERED by in
the presence of:

_____          _____
Name                                       THOMAS FRYE


SIGNED, SEALED AND DELIVERED by in
the presence of:

_____          _____
Name                                       BRIAN BRITTON


SIGNED, SEALED AND DELIVERED by in
the presence of:

_____          _____
Name                                       EMILIO EIZNER

<u>**SCHEDULE 6.05(e)**</u>

**Form of Second Closing Payment Note**

**PROMISSORY NOTE AND PLEDGE AGREEMENT**

US$●                                                    **Effective January 2, 2019**

    For value received, the undersigned hereby promises to pay to _____ (the "Seller") the sum of ● ($●) Dollars in lawful money of the United States. Such sum shall bear simple interest of 5% per annum, calculated annually on the anniversary of the date hereof in arrears, and shall be due and payable on or before ● (the "Expiry Date"), unless extended by mutual agreement by the parties, in which case, any reference to the Expiry Date shall mean any extended date agreed to by the parties.

    As continuing security for the due and timely payment and performance by the undersigned of its liabilities and obligations hereunder, the undersigned hereby grants to the Seller a security interest (the "Security Interest") in, to and over ● shares of common stock of La Vida Verde, Inc. (the "Pledged Securities") acquired with the principal amount and registered in the name of the undersigned and any and all property in any form derived, directly or indirectly, from any dealing with the Pledged Securities, including any and all shares of any other corporation or other entity received upon any reorganization, merger, amalgamation, arrangement, sale or other transaction involving the La Vida Verde, Inc. or its shareholders (collectively, the "Collateral").

    The undersigned hereby agrees to deliver to the Seller the certificates representing the Pledged Securities, accompanied by a duly executed stock transfer power in favour of the holder.  The undersigned shall forthwith deliver to the Seller to be held by the Seller hereunder, all other instruments, securities and negotiable documents of title in its possession or control which pertain to or form part of the Collateral, and shall, where appropriate, duly endorse the same for transfer in blank or as the Seller may direct and shall make all reasonable efforts to deliver to the Seller any and all consents or other instruments or documents necessary to comply with any restrictions on the transfer thereof in order to transfer the same to the Seller.

    Upon the failure of the undersigned to pay immediately when due any amounts payable hereunder, the Security Interest shall become enforceable and the Seller shall be entitled, forthwith or at any time thereafter, without notice to the undersigned, to do as follows:

    i.   commence legal action to enforce payment or performance of the liabilities and obligations of the undersigned hereunder;

    ii.   dispose of all or any part of the Collateral by private or public sale, lease or otherwise upon such terms and conditions as the Seller may determine;

    iii.   retain the Collateral irrevocably, to the extent not prohibited by law, by giving notice thereof to the undersigned and to any other persons required by law in the manner provided by law; and

    iv.   take any other action, suit, remedy or proceeding authorized or permitted by this Note, any applicable personal property security statute or by law or equity.

    The undersigned and all endorsers of this Note hereby waive presentment for payment, notice of non-payment, protest and notice of protest.

    This Note shall be governed by and construed in accordance with the laws of the State of California and the laws of the United States of America applicable therein.

This Note shall be binding upon the undersigned and its successors and permitted assigns and shall enure to the benefit of the Seller and his successors and assigns.

DATED effective as of the 2nd day of January, 2019.

**LVV HOLDING COMPANY LTD.**

Per: _____
     Steve Gormley, President